BURLINGTON NORTHERN RAILROAD
COMPANY and the Atchison, Topeka &
Santa Fe Railway Company, Petitioners,

v.

TUCO INC. and Southwestern Public
Service Company, Respondents.

No. 95–1317.

Supreme Court of Texas.

Argued Sept. 4, 1996.

Decided June 20, 1997.

Rehearing Overruled Dec. 4, 1997.

Harry DeLung, Jr., Chicago, IL, Michael
A. Hatchell, Tyler, George Whittenburg,
Charles G. White, Amarillo, Samuel M. Sipe,
Jr., David A. Stein, Washington, DC, for
Petitioners.

Donald M. Hunt, Lubbock, Cynthia Keely
Timms, Michael J. Boydston, Michael H. Col-
lins, Dallas, Charles R. Watson, Jr., Amarillo,
for Respondents.

PHILLIPS, Chief Justice, delivered the
opinion of the Court, in which GONZALEZ,
HECHT, CORNYN, OWEN and BAKER,
Justices, join.

Under section 171.014 of the Texas Civil
Practice and Remedies Code, a court shall
vacate an arbitration award if there has been

"evident partiality by an arbitrator appointed as a neutral." We hold that a neutral arbitrator selected by the parties or their representatives exhibits evident partiality under this provision if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. Applying this standard in the case before us, we hold that the neutral arbitrator's failure to disclose his acceptance, during the course of the arbitration proceedings, of a substantial referral from the law firm of a non-neutral co-arbitrator established evident partiality as a matter of law. Because the court of appeals determined that a fact issue existed about evident partiality, 912 S.W.2d 311, we modify the judgment of the court of appeals and remand this cause to the trial court with instructions to vacate the arbitration award.

I

TUCO, Inc., an Amarillo-based company, purchases coal from mines in Wyoming for resale to Southwestern Public Service Company to fuel its electric generating plants in the Texas Panhandle. In 1984, TUCO entered into two 18–year contracts with Burlington Northern Railroad Company and the Atchison, Topeka & Santa Fe Railway Company (collectively, the "Carriers") for transporting coal from Wyoming to Texas. These contracts, which generally contain the same terms, provide for periodic rate adjustments based on changes in the Carriers' "productivity," a measure which is tied to operating costs but which is not precisely defined in the contracts. During a 1990 contractual rate review, the parties disputed the meaning and scope of the term "productivity," and thus

could not agree on the proper rate adjustment. TUCO asserts that the difference in the parties' positions amounted to more than $150 million. Under the contracts, TUCO submitted the dispute to arbitration under the Texas General Arbitration Act. See Tex. Civ. Prac. & Rem.Code § 171.001 et seq.

The contracts required each side to select one arbitrator, who in turn would mutually select the third arbitrator.[1] While they prohibit the parties from selecting their own employees as arbitrators, the contracts do not specify whether the two arbitrators that the parties unilaterally selected (the "party arbitrators") would be neutral or would represent the interests of the party appointing them. There is no dispute, however, that the parties intended and understood that the party arbitrators would be aligned with, act as advocates for, and ultimately side with the appointing party. Under this scenario, the third arbitrator would act as the only neutral decisionmaker.[2]

As party arbitrators, TUCO appointed Richard Hardy, a retired transportation attorney, while the Carriers selected Emried Cole, an attorney with the Baltimore firm of Venable, Baetjer and Howard ("Venable–Baetjer"). When the parties exchanged lists of potential neutral arbitrators, George Beall, a Baltimore attorney, appeared on both lists. When the party arbitrators interviewed Beall to determine whether he had any potential conflicts, Beall disclosed that Cole's law firm, Venable–Baetjer, had twice previously retained him as an expert witness. TUCO's investigation of these occurrences revealed that they involved a relatively small amount of time and fees and were no longer ongoing.[3] TUCO and Hardy thus concluded that

1. If the arbitrators appointed by the parties could not agree on the third arbitrator, the contracts allowed either party to apply to the Chief Judge of the United States District Court for the Northern District of Texas for appointment of the third arbitrator.

2. This is an often-used arbitration format. See, e.g., Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); Forsythe Int'l, S.A. v. Gibbs Oil Co., 915 F.2d 1017, 1019 (5th Cir.1990); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 676 (7th Cir.1983); Lozano v. Maryland Cas. Co., 850 F.2d 1470, 1472 (11th Cir.1988); Middlesex Mut. Ins.

Co. v. Levine, 675 F.2d 1197, 1199 (11th Cir. 1982); Safeco Ins. Co. v. Stariha, 346 N.W.2d 663, 664 (Minn.Ct.App.1984). While it is not expressly approved by the Texas General Arbitration Act, the Act appears to implicitly recognize this procedure by referring to an arbitrator "appointed as a neutral" in section 171.014(a)(2).

3. Hardy's summary judgment affidavit, which is not disputed, states that "[t]hese matters were in the past, i.e., they had been completed, and they involved a relatively little effort and a small amount of fees." Samuel Sipe, the Carriers' lead arbitration counsel, testified in his deposition that on one of the occasions, Venable–Baetjer

they would not affect Beall's impartiality. In response to the parties' joint request, Beall agreed to serve as the neutral arbitrator in October 1991.

After conducting discovery, TUCO and the Carriers submitted exhibits and sworn witness statements to the arbitrators in January and February 1992. A live hearing was then scheduled for March 23, 1992, solely for the purpose of cross-examining the witnesses based on their written testimony.

The referral which lies at the heart of the present dispute occurred about three weeks before the March arbitration hearing. The Resolution Trust Corporation had asserted a substantial damage claim against Thomas Mullan, Jr., a former director of a failed savings and loan institution. James Wright, a partner at Venable–Baetjer who regularly represented Mullan, could not handle the RTC claim because of a conflict of interest. Wright did, however, meet with Gail Stern, the general counsel of Mullan's family business, to discuss who might serve as litigation counsel. During this meeting, either Wright or Stern suggested Beall.[4] After two other lawyers selected by Stern declined the case, she asked Wright to contact Beall. Wright did so, arranging a meeting between Stern, Beall, himself, and Mullan's son.[5] Based on this meeting, Mullan selected Beall to represent him, apparently on advice from his son and Stern. Although Wright attended the meeting and briefed the other participants on the background of the RTC's claim, he had no authority to determine whether Beall should be hired.

The Mullan case was a substantial piece of federal litigation involving claims in excess of $1 million. Even though his co-arbitrator's law firm was directly involved in the referral, Beall testified that he concluded that the

paid Beall about $3,000 to review its file in a matter and deliver brief testimony about the reasonableness of the firm's fees. On the second occasion, the details of which are not disclosed in the record, Beall did not actually testify, instead only preparing an affidavit, and he could not recall how much he had been paid. The record also does not disclose the precise date of either of these prior associations between Beall and Venable–Baetjer.

4. Wright states in his affidavit that he could not recall whether he or Stern first raised Beall's

matter was not material to the arbitration proceedings. Therefore, he continued serving on the panel without disclosing the referral to TUCO or Hardy. It is undisputed that Cole also did not know about the referral, and that he had no involvement in its procurement. Similarly, when Wright referred the Mullan case to Beall, he had no knowledge of the arbitration proceedings or that Beall was serving on an arbitration panel with another Venable–Baetjer partner.

At the conclusion of the arbitration hearing on March 27, 1992, Beall ruled for the Carriers. Siding with Cole, he disposed of the major issues in their favor, including the productivity rate adjustments.

About a month later, on April 21, the arbitrators met to decide several lesser issues which were still pending. During the course of this meeting, Hardy overheard Beall remark to Cole that "we've already begun work on the matter you folks were so kind to send over." The record does not disclose Cole's response, if any, to this remark. As noted previously, TUCO does not contend that Cole knew of the Mullan referral prior to this time.

The panel issued its written decision on May 12, 1992. In his dissent, Hardy accused Beall of bias, contending that Beall made up his mind on key issues before hearing or reviewing the relevant evidence. Hardy cited the comment he had overheard regarding the referral, speculating that the referral could have been the source of the alleged bias. While it is not clear whether Hardy told TUCO about the referral prior to issuing his written dissent, it is undisputed that TUCO knew nothing of the referral until after the panel had decided the remaining issues discussed at the April 21 meeting.[6]

name. Stern's affidavit does not address the issue, although she does state that another attorney, not associated with Venable–Baetjer, had earlier recommended Beall to her.

5. Mullan at the time was in his eighties and retired from his family's construction and real estate development business.

6. The court of appeals stated that TUCO's attorney became aware of the referral "shortly before the closing presentations" and "made no objec-

TUCO filed this suit to set aside the arbitration award, contending that the undisclosed referral rendered Beall evidently partial.[7] TUCO also contended that the arbitrators had exceeded their authority by essentially reforming, rather than simply interpreting, the transportation contracts. After both parties moved for summary judgment, the trial court granted summary judgment for the Carriers upholding the arbitration award.

TUCO appealed to the court of appeals, arguing that Beall was under a duty to disclose the referral and that his failure to do so was "evident partiality" under section 171.014 of the Texas Civil Practice and Remedies Code as a matter of law. That section provides in relevant part:

> (a) Upon application of a party, the court shall vacate an award where:
>
>   \*    \*    \*    \*    \*    \*
>
> (2) there was *evident partiality by an arbitrator appointed as a neutral* or corruption in any of the arbitrators or misconduct or wilful misbehavior of any of the arbitrators prejudicing the rights of any party.

TEX. CIV. PRAC. & REM.CODE § 171.014(a)(2) (emphasis added). Alternatively, TUCO argued that the arbitrators exceeded their authority in deciding the dispute. Thus, TUCO contended, the trial court erred in granting the Carriers' motion for summary judgment and in not granting TUCO's.

The court of appeals concluded that an arbitrator exhibits evident partiality under the statute when the arbitrator fails to disclose any relationship which might reasonably create an appearance of partiality or bias. 912 S.W.2d at 318. Noting that TUCO had been concerned about Beall's past relationship with Venable–Baetjer, and that Beall had essentially thanked Cole for the referral in the midst of the arbitration proceedings, the court of appeals concluded that a fact issue existed about evident partiality

under this standard. *Id.* The court thus reversed the summary judgment for the Carriers on this issue. *Id.* However, the court did not render judgment for TUCO, instead remanding the cause to the trial court for a trial on evident partiality. *Id.* The court did not address TUCO's alternative argument that the arbitrators had exceeded their authority. TUCO and the Carriers both applied to this Court for writ of error.

## II

### A

The parties' contracts provide that disputes "shall be arbitrated pursuant to the provisions of the Texas General Arbitration Act," and neither party disputes that the Texas Act is controlling. TUCO argues that Beall exhibited "evident partiality" under section 171.014 of the Texas Act by accepting the Mullan case during the course of the arbitration proceedings without disclosing that fact to TUCO. While this Court has not previously determined the scope of this standard, numerous courts in other jurisdictions have done so, as "evident partiality" is also a basis for vacating awards under the Federal Arbitration Act, *see* 9 U.S.C. § 10, as well as the arbitration statutes of many sister states.

The seminal "evident partiality" case is *Commonwealth Coatings Corporation v. Continental Casualty Company*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). There, the parties in a subcontractor's suit against the prime contractor's surety submitted the claims to arbitration under the parties' agreement. As here, each party selected one arbitrator, who then jointly selected a neutral arbitrator. Unknown to the claimant, the prime contractor had been a regular customer of the neutral arbitrator's engineering consulting business. While there had been no dealings between them during the preceding year, the prime contractor's patronage had been repeated and significant. The claimant, who learned of this relation-

---

tions to Beall's continued participation." 912 S.W.2d at 314. This statement is not supported by the record.

**7.** Southwestern Public Service Company intervened in the proceedings, aligning itself with

TUCO in the trial court and on appeal. In characterizing the parties' arguments, we refer to TUCO and Southwestern Public Service Company collectively as TUCO.

ship only after receiving an adverse decision from the neutral arbitrator, challenged the award on the basis of evident partiality. *Id.* at 146, 89 S.Ct. at 338.

Justice Black, in delivering the Court's opinion, concluded that the "evident partiality" standard reflects Congress' efforts to ensure that arbitration be impartial. *Id.* at 147, 89 S.Ct. at 338. While recognizing that arbitrators are not expected to sever their ties with the business world, the Court concluded that it must be scrupulous in safeguarding the impartiality of arbitrators, because they have "completely free rein to decide the law as well as the facts and are not subject to appellate review." *Id.* at 149, 89 S.Ct. at 339. To achieve this goal, the Court imposed "the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id.* Although the Court noted that there was no evidence of actual bias in the case before it, the arbitrator's failure to disclose his business relationship with the prime contractor constituted evident partiality justifying vacation of the award. *Id.* at 147, 89 S.Ct. at 338.

In a concurring opinion, Justice White stated that he joined the Court's opinion, but he emphasized that the Court was not subjecting arbitrators to the "same standards of judicial decorum" as judges. *Id.* at 150, 89 S.Ct. at 340. "It is often because [arbitrators] are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function." *Id.* Justice White thus reasoned that an arbitrator should not be disqualified because of a business relationship with a party, if the parties are aware of the relationship and are willing to accept any risk of conflict. *Id.* However, because the parties must be aware of all non-trivial relationships in order to exercise this judgment, Justice White agreed on a rule of full disclosure:

> [I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or dis-

gruntled party can seize on it as a pretext for invalidating the award.

*Id.* at 151, 89 S.Ct. at 340. While cautioning arbitrators to err on the side of disclosure, Justice White recognized that some undisclosed relationships would be "too insubstantial to warrant vacating an award." *Id.* at 152, 89 S.Ct. at 341.

Although Justices White and Marshall joined fully in Justice Black's opinion for the Court, some lower federal courts have purported to see a conflict between the two writings. By treating Justice Black's opinion as a mere plurality, they have felt free to reject the suggestion that "evident partiality" is met by an "appearance of bias," and to apply a much narrower standard.

For example, in *Morelite Construction Corporation v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79 (2nd Cir.1984), the court expressly referred to Justice Black's opinion as one for a plurality of four justices. *Id.* at 82. Working "on a relatively clean slate," the court reasoned that parties agree to arbitrate precisely because they prefer a panel with expertise regarding the subject matter of the dispute. *Id.* at 83. Because this expertise often comes through experience in the field, which may have involved personal dealings with the parties, the court concluded that something more than an "appearance of bias" was necessary to disqualify an arbitrator. *Id.* at 83–84. "[T]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all." *Id.* at 83. Balancing the competing goals of expertise and impartiality, the court concluded that an arbitrator is "evidently partial" only where the circumstances were such that a "reasonable person *would have to conclude* that [the] arbitrator was partial to one party to the arbitration." *Id.* at 84 (emphasis added).

At least three other federal circuits have also adopted an "evident partiality" standard. *See Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir.1993) (adopting the *Morelite* standard); *Apperson v. Fleet Carrier Corp.*, 879 F.2d

1344, 1358 (6th Cir.1989) (same); *Health Services Management Corp. v. Hughes,* 975 F.2d 1253, 1264 (7th Cir.1992) (holding that the alleged conflict "must be so intimate ... as to cast serious doubt on the arbitrator's impartiality," and further holding that the interest or bias "must be direct, definite and capable of demonstration rather than remote, uncertain or speculative").

In contrast, other federal courts, focusing on the need for full disclosure to parties who are choosing their own arbitrators, have adopted a broader standard. For example, in *Schmitz v. Zilveti,* 20 F.3d 1043, 1049 (9th Cir.1994), the court held that an arbitrator had a duty to disclose that his law firm had represented the parent company of an arbitrating party. The court reasoned that "parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed." *Id.* at 1047. Concluding that *Commonwealth Coatings* was controlling precedent, the court decided that the "best expression" of the Supreme Court's holding is that evident partiality is present when "undisclosed facts show a reasonable impression of partiality." *Id.* at 1046. This standard, of course, is much broader than that articulated in *Morelite,* as circumstances can convey an *impression* of partiality without necessarily dictating a *conclusion* of partiality, as required under *Morelite. See also Middlesex Mutual Ins. Co. v. Levine,* 675 F.2d 1197, 1200 (11th Cir.1982) (adopting "reasonable impression of possible bias" standard, and holding that arbitrator had a duty to disclose that he was involved in an ongoing legal dispute with an insurer party); *Olson v. Merrill Lynch, Pierce, Fenner & Smith,* 51 F.3d 157, 159–60 (8th Cir.1995) (recognizing that disclosure of "even indirect ties" will aid the arbitration process, and holding that arbitrator was under a duty to disclose business relationship between his firm and party); *Al–Harbi v. Citibank, N.A.,* 85 F.3d 680, 683 (D.C.Cir.1996) (recognizing arbitrator's duty to disclose facts which "might create an impression of possible bias").

State courts, interpreting the scope of "evident partiality" under their respective arbitration statutes, are also divided between the broader view reflected by *Schmitz* and the narrower view of *Morelite. See Wheeler v. St. Joseph Hosp.,* 63 Cal.App.3d 345, 133 Cal.Rptr. 775, 793 (1976) (adopting "impression of possible bias" standard and holding that arbitrator had duty to disclose business relationship with party's law firm); *San Luis Obispo Bay Properties v. Pacific Gas & Elec. Co.,* 28 Cal.App.3d 556, 104 Cal.Rptr. 733, 741 (1972) (adopting "impression of possible bias" standard but holding that business referrals between neutral arbitrator and party arbitrator did not need to be disclosed because the referrals were not for consideration); *Haynes Constr. Co. v. Cascella & Son Constr., Inc.,* 36 Conn.App. 29, 647 A.2d 1015, 1018–19 (1994) (holding that arbitrator must disclose facts "that might tend to indicate partiality or bias" but concluding that potential conflict arising from attorney-client relationship between arbitrator and in-laws of party's principal had been waived); *Local 530, AFSCME, Council 15 v. City of New Haven,* 9 Conn.App. 260, 518 A.2d 941, 949 (1986) (adopting *Morelite* standard and holding that the fact that arbitrator hearing labor grievance from police officer had been appointed to public office by mayor did not constitute evident partiality); *John E. Reid & Assoc. v. Wicklander–Zulawski & Assoc.,* 255 Ill.App.3d 533, 194 Ill.Dec. 232, 238, 627 N.E.2d 348, 354 (1993) (suggesting an "actual bias" standard and holding that arbitrator's long-term business relationship with parents of party's witness did not require vacation of award); *In re Arbitration Between U.S. Turnkey Exploration, Inc. and PSI, Inc.,* 577 So.2d 1131, 1135 (La.Ct.App.1991) (adopting *Morelite* standard and holding that arbitrator's advice to party regarding presentation of evidence was not evident partiality); *Albion Public Schools v. Albion Educ. Ass'n,* 130 Mich.App. 698, 344 N.W.2d 55, 57 (1983) (holding that arbitrator must disclose facts which may reasonably lead to an impression or appearance of bias and vacating award because arbitrator failed to disclose that he had previously served as consultant for a party); *Safeco Ins. Co. v. Stariha,* 346 N.W.2d 663, 667 (Minn.Ct.App.1984) (although refusing to vacate the award where the neutral arbitrator had represented the law firm of counsel for a party, prospectively

adopting rule requiring full disclosure of any relationship which "might reasonably create an appearance of partiality or bias"); *Herrin v. Milton M. Stewart, Inc.,* 558 So.2d 863, 865 (Miss.1990) (holding that, to justify vacating arbitration award, partiality "must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative" and concluding that evident partiality may not be shown merely from adverse ruling on merits); *National Ave. Bldg. Co. v. Stewart,* 910 S.W.2d 334, 343 (Mo.Ct.App. 1995) (holding that, to constitute evident partiality, the interest or bias of the arbitrator must be "direct, definite and capable of demonstration rather than remote, uncertain, or speculative" and concluding that arbitrator's offer to serve as consultant for a party did not warrant vacating the award); *Barcon Assoc. v. Tri-County Asphalt Corp.,* 86 N.J. 179, 430 A.2d 214, 220 (1981) (adopting "appearance of partiality" standard and holding that arbitrator had duty to disclose business relationship with party); *Kern v. 303 East 57th St. Corp.,* 204 A.D.2d 152, 611 N.Y.S.2d 547, 548–49 (N.Y.App.Div.1994) (adopting "appearance of partiality" standard and holding that arbitrator had duty to disclose that party's attorney had referred business to him during arbitration proceedings); *Beck Suppliers, Inc. v. Dean Witter Reynolds, Inc.,* 53 Ohio App.3d 98, 558 N.E.2d 1187, 1193 (1988) (rejecting "appearance of bias" standard and holding that arbitrator did not exhibit evident partiality merely because his law firm represented corporate affiliates of party); *DeBaker v. Shah,* 194 Wis.2d 104, 533 N.W.2d 464, 467–69 (1995) (holding that arbitrator must disclose all facts "which may reasonably support an inference of ... partiality," but concluding that arbitrator's past receipt of small campaign contributions from lawyers associated with arbitration counsel was too trivial to require disclosure).

There appear to be only two other Texas courts of appeals cases interpreting the statutory "evident partiality" standard. *See Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *City of Baytown v. C.L. Winter, Inc.,* 886 S.W.2d 515 (Tex.App.— Houston [1st Dist.] 1994, writ denied). In *Babcock,* the court relied on federal precedents to hold that a person challenging an award under evident partiality "must prove the existence of facts which would establish a reasonable impression of the arbitrator's partiality to one party." 863 S.W.2d at 233. This language is substantially similar to the Ninth Circuit's articulation in *Schmitz* and the Eleventh Circuit's language in *Middlesex Mutual Insurance Company v. Levine,* 675 F.2d 1197, 1201 (11th Cir.1982), and is clearly intended to parallel the broad approach of *Commonwealth Coatings. See Schmitz,* 20 F.3d at 1047; *Middlesex,* 675 F.2d at 1201. In *City of Baytown,* the court simply quoted the standard from *Babcock. See* 886 S.W.2d at 520.

Further, at least one Texas court reviewing arbitration awards under common law standards has relied on *Commonwealth Coatings* to hold that arbitrators must disclose to the parties any dealings that might create an impression of possible bias. *See House Grain Co. v. Obst,* 659 S.W.2d 903, 907 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

### B

■ As Justice White noted in *Commonwealth Coatings,* the most capable arbitrators are often those persons with extensive experience in the industry, who may naturally have had past dealings with the parties. Thus, arbitrators should not be per se disqualified because of a business relationship with a party. *See* 393 U.S. at 150, 89 S.Ct. at 340 (White, J., concurring). Instead, the competing goals of expertise and impartiality must be balanced. Where the parties have agreed to select their own arbitrators, they should strike this balance in the selection process. To choose their arbitrators intelligently, however, the parties must have access to all information which might reasonably affect the arbitrator's partiality. This allows the parties to evaluate any potential bias at the outset, rather than shifting the burden to the courts to do so when a dissatisfied party challenges an award. As Justice White noted in *Commonwealth Coatings:*

The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to

the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring). This strong policy favoring the up-front disclosure of potential conflicts underscored the Supreme Court's "simple" requirement that arbitrators disclose any dealings "that might create an impression of possible bias." 393 U.S. at 149, 89 S.Ct. at 339.

Of course, not all arbitration procedures grant the parties veto power over particular arbitrators. *See, e.g., Apperson,* 879 F.2d at 1347 (collective bargaining agreement provided for arbitration committees); *Morelite,* 748 F.2d at 81 (collective bargaining agreement provided for designation of a single neutral arbitrator without participation of the parties); *Toyota of Berkeley v. Automobile Salesmen's Union,* 834 F.2d 751, 754 (9th Cir.1987) (same as *Morelite* ). The issue identified by these courts is not whether parties have access to all relevant information to aid their selection, because there is no selection to be made. Rather, the issue becomes whether the conflict is so severe as to indicate that partiality or bias played a role in the arbitrator's decision. Thus, some courts addressing "evident partiality" have applied different standards depending on the nature of the arbitration. For example, the court in *Schmitz,* emphasizing that parties should be able to choose their arbitrators wisely, adopted a "reasonable impression of partiality" standard for arbitrators chosen by the parties, but indicated that a narrower standard more akin to actual bias would apply in other cases. 20 F.3d at 1047. *See also Woods v. Saturn Distribution Corp.,* 78 F.3d 424, 427 (9th Cir.1996); *Lifecare Int'l Inc. v. CD Medical, Inc.,* 68 F.3d 429, 433 (11th Cir.1995); *Barcon Assoc. v. Tri–County Asphalt Corp.,* 86 N.J. 179, 430 A.2d 214, 219–20 (1981).

█ We agree that the standards may differ depending on the nature of the arbitration. This case, however, requires us only to settle on a standard for those categories where the parties select their arbitrators.

Because we agree with the policy arguments advanced in *Commonwealth Coatings* and *Schmitz,* we hold that a prospective neutral arbitrator selected by the parties or their representatives exhibits evident partiality if he or she does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. We emphasize that this evident partiality is established from the *nondisclosure itself,* regardless of whether the nondisclosed information necessarily establishes partiality or bias. *See Commonwealth Coatings,* 393 U.S. at 147, 89 S.Ct. at 338–39 (finding evident partiality based on arbitrator's failure to disclose conflict, even though there was no evidence of actual bias); *Schmitz,* 20 F.3d at 1047. Those courts which have failed to recognize a comparable standard have, we believe, needlessly involved themselves in evaluations of partiality that are better left to the parties. *See, e.g., Consolidation Coal Co. v. Local 1643,* 48 F.3d 125 (4th Cir.1995); *Hobet Mining, Inc. v. International Union, United Mine Workers of America,* 877 F.Supp. 1011 (S.D.W.Va.1994).

This standard accords with Canon II of the CODE OF ETHICS FOR ARBITRATORS IN COMMERCIAL DISPUTES, which provides:

A. Persons who are requested to serve as arbitrators should, before accepting, disclose:

\*   \*   \*   \*   \*   \*

(2) Any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create any appearance of partiality or bias. . . .

\*   \*   \*   \*   \*   \*

C. The obligation to disclose interests or relationships described in the preceding paragraph A is a continuing duty which requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests or relationships which may arise, or which are recalled or discovered.

This Code has been adopted jointly by the American Bar Association and the American Arbitration Association. Because the statu-

tory prohibition against "evident partiality" applies only to neutral arbitrators, *see* TEX. CIV. PRAC. & REM.CODE § 171.014(a)(2), this duty of disclosure does not apply to party arbitrators not intended to be neutral. We need not and do not decide the proper standard for those cases where a party is attempting to establish "evident partiality" of an arbitrator which the parties did not select.

The Carriers argue that an arbitrator is evidently partial in a nondisclosure case only if he or she fails to disclose "a direct financial or business relationship with a party or its agent." We disagree with such a restrictive standard. As discussed, the parties should have access to all information that might reasonably affect the potential arbitrator's impartiality. This could obviously include, for example, a familial or close social relationship.

█ While a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure. The rule of full disclosure minimizes the role of the judiciary, vesting greater control in the parties who have chosen the arbitration process. If faithfully adhered to, it will ultimately lead to fewer post-decision challenges to awards based on bias or prejudice.

### C

█ Finally, we apply this standard to the facts of this case. The present circumstances are somewhat unique in that the suspect relationship (the referral) arose *after* the parties selected Beall as the neutral arbitrator. Beall thus could not have disclosed the potential conflict during the pre-selection interviews. Nonetheless, because the parties agreed to select their own arbitrators, this case is properly analyzed under the standard we have articulated above. Before agreeing to select Beall as the neutral arbitrator, TUCO and Hardy sought to learn of any relationship that might reasonably affect his

impartiality. In basing their decision on this information, TUCO and Hardy were entitled to assume that Beall would not enter into any new such relationship during the course of the arbitration proceedings without disclosing it.[8] We therefore hold that the disclosure standard we have articulated today likewise applies to conflicts arising during the course of the arbitration proceedings. Moreover, to preserve the integrity of the selection process, we hold that a party who could have vetoed the arbitrator at the time of selection may disqualify the arbitrator during the course of the proceedings based on a new conflict which might reasonably affect the arbitrator's impartiality. If this were not the rule, the control which the parties contracted for in the arbitration agreement would be undermined.[9]

█ Upon reviewing the undisputed facts, we hold that, because of Venable–Baetjer's involvement, the referral to Beall might have conveyed an impression of Beall's partiality to a reasonable person. The Mullan case was a major piece of litigation, expected to generate substantial fees for Beall. While Wright (the Venable–Baetjer partner involved in the referral) did not have the authority to hire Beall, and might not have been the one to initially raise Beall's name, he nonetheless initiated the contact with Beall on Mullan's behalf, arranging the meeting leading to Beall's hiring.

Further, the fact that neither Wright nor Cole was aware of the other's relationship with Beall does not negate the impression of partiality. An objective observer could still reasonably believe that a person in Beall's position, grateful for the referral, may have been inclined to favor Venable–Baetjer as an entity (and thus Wright indirectly) in the arbitration proceedings by siding with Cole. After all, Beall himself was moved to thank Cole during the arbitration proceedings for the "matter you folks were so kind to send over."

---

8. The letter from the parties confirming Beall's selection stated that he was being hired based on his assurance, subject to a conflicts review, that he knew of no condition "that would in any way detract from [his] ability to render a truly impartial decision."

9. Of course, a party who learns of a conflict before the arbitrator issues his or her decision must promptly object to avoid waiving the complaint. Here, it is undisputed that TUCO did not learn of the referral until after the panel had decided the issues before it.

The Carriers argue that TUCO and Hardy have no standing to complain about the referral because of their willingness to accept Beall with full knowledge of his prior work as an expert witness for Venable–Baetjer. We conclude, however, that a person might reasonably differentiate between a past relationship and one that arises shortly before or during the arbitration proceedings. More importantly, as we have emphasized, it is for the parties to determine, after full disclosure, whether a particular relationship is likely to undermine an arbitrator's impartiality.

The Carriers also argue that this relationship is too indirect because Venable–Baetjer was neither a party in the arbitration proceedings nor counsel for a party. This argument ignores the arbitration format chosen by the parties, in which the party arbitrators acted as advocates for the party appointing them. As one court has recognized, "[a]n arbitrator appointed by a party is a partisan only one step removed from the controversy. . . ." *Lozano v. Maryland Cas. Co.,* 850 F.2d 1470, 1472 (11th Cir.1988).

The Carriers cite numerous cases where courts have refused to find evident partiality on facts which, according to the Carriers, are more egregious than ours. *See International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 551 (2nd Cir.1981); *Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.,* 991 F.2d 141, 146 (4th Cir.1993); *Consolidation Coal Co. v. Local 1643, United Mine Workers of America,* 48 F.3d 125, 129 (4th Cir.1995); *United States Wrestling Federation v. Wrestling Division of the AAU, Inc.,* 605 F.2d 313, 319 (7th Cir.1979); *Ormsbee Dev. Co. v. Grace,* 668 F.2d 1140, 1150 (10th Cir.1982); *Lozano v. Maryland Cas. Co.,* 850 F.2d 1470, 1472 (11th Cir.1988); *Alaska State Housing Auth. v. Riley Pleas, Inc.,* 586 P.2d 1244, 1248 (Alaska 1978); *Safeco Ins. Co. v. Stariha,* 346 N.W.2d 663, 666 (Minn.Ct.App. 1984); *DeBaker v. Shah,* 194 Wis.2d 104, 533 N.W.2d 464, 469 (1995). We are not persuaded by these authorities.

*Peoples Security Life* and *Consolidation Coal* follow the narrower standard of *Morelite,* which, for reasons we have already explained, we reject as the controlling standard in nondisclosure cases. In *International*

*Produce,* a Second Circuit decision preceding *Morelite,* the court employed a similarly strict standard approaching actual bias. *See* 638 F.2d at 551 ("There was no claim of bias on the part of [the neutral arbitrator], or even of any animosity toward any counsel. Thus, the record is completely bare of anything remotely resembling 'evident partiality.' ") The court accordingly refused to disqualify a neutral arbitrator because he was scheduled to appear as a witness in an unrelated arbitration proceeding involving the same law firms (but different parties) as the dispute he was arbitrating.

The other cases cited by the Carriers are also factually or procedurally distinguishable. In *United States Wrestling Federation,* the neutral arbitrator failed to disclose that his law firm represented Northwestern University, which was a member of the NCAA, which in turn was affiliated with one of the parties to the arbitration. The neutral arbitrator's firm had no direct relationship with either the NCAA or the parties. The court held that this "tenuous chain" was too "remote, uncertain, and speculative to require the arbitration award to be set aside." 605 F.2d at 320. In *Ormsbee,* the neutral arbitrator had some clients in common with the law firm representing one of the parties, which the court rejected as a basis of evident partiality. The court did not clearly articulate the standard it was applying, merely concluding that "only clear evidence of impropriety justifies the denial of summary confirmation of arbitration awards." 668 F.2d at 1150. Furthermore, the neutral arbitrator was not selected by the parties, but rather by the American Arbitration Association. Consequently, the court did not discuss the policy considerations of full disclosure where parties are selecting their arbitrators. In *Lozano,* the neutral arbitrator and counsel for one of the parties were both investors in two limited partnerships, consisting of seven and nine limited partners respectively. Neither had control over the partnership activities. The court cited the findings of the district court comparing this financial relationship with "two individuals buying the same issue of corporate stock or investing in the same

mutual fund." 850 F.2d at 1471. The court consequently found no evident partiality. The court also rejected a challenge based on the fact that the neutral arbitrator's law firm represented clients arties in unrelated litigation. There was no evidence that these cases were active at the time of the arbitration or that the neutral arbitrator was even aware that they existed. *Id.* at 1472. In *Alaska State Housing Authority,* the lawyer for one of the parties had previously represented the neutral arbitrator in unrelated litigation. This relationship was disclosed to and accepted by the opposing party. That party complained on appeal, however, because the arbitrator had failed to disclose that the opposing attorney had also represented the neutral arbitrator's *partnership* in unrelated litigation. The court concluded that nondisclosure of this relationship was not material in light of the parties' acceptance of the direct attorney-client relationship between the attorney and the arbitrator. 586 P.2d at 1249. In *Safeco,* the neutral arbitrator failed to disclose that he had on one previous occasion represented the law firm representing one of the parties to the arbitration. The court, in finding that this did not constitute evident partiality, noted that it was a "remote and unrelated" event which had been concluded prior to the neutral's selection as arbitrator. 346 N.W.2d at 666. Notably, however, the court prospectively adopted rules requiring the disclosure of any business or social relationship "likely to affect impartiality or which might reasonably create an appearance of partiality or bias." *Id.* at 667. In *DeBaker,* members of the law firm representing one of the parties to the arbitration had, several months earlier, made campaign contributions to the neutral arbitrator in an unsuccessful congressional primary race. None of the attorneys involved in the arbitration case had made contributions, all of the contributions were matters of public record, and the aggregate amount was $1,475. Under these circumstances, the court concluded that the failure to disclose the contributions did not constitute evident partiality. 533 N.W.2d at 469.

While we need not and do not intimate how we would decide the above cases, it is sufficient to note that, in our view, they do not persuade us that either our test or its application to the facts before us is incorrect.

The dissent apparently would hold that a business relationship between a party arbitrator and a neutral arbitrator can never cause evident partiality, because the party arbitrator is not an agent for the appointing party. While we need not and do not decide whether a party arbitrator serves as an "agent," it is undisputed that the party arbitrators in this case were not neutral, but were open advocates for their respective appointing parties. Under these circumstances, it would ignore reality to hold that a business relationship between a party and a neutral arbitrator cannot render the neutral arbitrator evidently partial. Because of the policy reasons favoring full disclosure, we disagree with *San Luis Obispo Bay Properties v. Pacific Gas & Electric Company,* 28 Cal.App.3d 556, 104 Cal.Rptr. 733 (1972), on which the dissent relies, to the extent that it holds that business referrals between a party arbitrator and a neutral arbitrator need not be disclosed.

Nothing in our opinion should be taken as a conclusion that Beall, a highly respected member of the Maryland bar with a distinguished record of public service,[10] was in fact biased. Moreover, we fully recognize that reasonable people could debate whether the referral was likely to affect Beall's impartiality. We reiterate Justice White's comments that the most capable arbitrators are often those with ties to the business community. But the fact that a reasonable person could conclude that the referral *might* affect Beall's impartiality triggers the duty of disclosure. Beall's failure to disclose the referral thus constitutes evident partiality under the Act.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, we modify the judgment of the court of appeals and remand this cause to the trial court with instructions to vacate the arbitration award and to refer

---

10. Beall formerly served as United States Attorney for the District of Maryland.

the dispute for further arbitration under the agreement of the parties.

ENOCH, Justice, joined by SPECTOR and ABBOTT, Justices, dissenting.

In enacting a statute intended to make arbitration agreements and awards enforceable, the Legislature provided that arbitration awards could be vacated if a neutral arbitrator showed "evident partiality" toward one party. TEX. CIV. PRAC. & REM.CODE § 171.014(a)(2). Today, the Court strips the word "evident" from that statute.

"Evident" means "clear to the understanding; manifest; obvious; conclusive." WEBSTER'S THIRD NEW INT'L DICTIONARY 789 (1961); BLACK'S LAW DICTIONARY 557(6th ed. 1990). Unlike the Court's "impression" of partiality standard, the *Morelite* standard is consistent with the plain meaning of "evident" partiality. As the Seventh Circuit has held, the alleged conflict must be "so intimate ... as to cast serious doubt on the arbitrator's impartiality" and must be "direct, definite and capable of demonstration rather than remote, uncertain or speculative." *Health Services Management Corp. v. Hughes,* 975 F.2d 1253, 1264 (7th Cir.1992). I would hold that under this test, a neutral arbitrator need not disclose a circumstance that arises after the proceedings begin unless a reasonable person could believe the circumstance creates actual bias on the part of the arbitrator.

In this case, TUCO's only evidence of "impression" of partiality is Beall's failure to disclose a referral, made during the arbitration proceedings, from his co-arbitrator's law firm. There is no evidence at all that Cole, the co-arbitrator, knew of the referral. In fact, the evidence is just the opposite. Further, Beall had already disclosed his historical business relationship with Cole's law firm. Finally, it is undisputed that Beall had no relationship whatsoever with the carriers. The Court's conclusion of partiality is premised on nothing but pure speculation of partiality by Beall toward one of the carriers.

A major flaw in the Court's reasoning is that it requires one to assume Cole is essentially an agent for the party that appointed him. Although Cole was chosen by the carriers, he is not their agent. While a party arbitrator may be generally favorable to that party's position, he or she may not abandon all semblance of the independence befitting a quasi-judicial position. *See* American Arbitration Ass'n., *Code of Ethics for Arbitrators in Commercial Disputes* (1977, 1993)(Although Canon VII–E permits a party-appointed arbitrator "to be predisposed toward deciding in favor of the party who appointed [him or her]," Canon V provides that "[a]n arbitrator should decide all matters justly, exercising independent judgment, and should not permit outside pressure to affect the decision."); Deseriee A. Kennedy, *Predisposed With Integrity: The Elusive Quest for Justice in Tripartite Arbitrations,* 8 Geo. J. Legal Ethics 749, 768 (1995) ("party arbitrators should be required to abide by the same level of ethical standards required of any other decisionmaker of a quasi-judicial capacity.")

Moreover, that the Court accepts the idea that a party-appointed arbitrator is the agent of the party that appointed him or her condones a violation of Canon V. This is so because an agent has a fiduciary obligation to look out for his principal's interests. Not even the parties contemplated such a role for party arbitrators. Their agreement specifically states that neither party may appoint its own direct agent (i.e. employee) as an arbitrator. No reason would exist for such a provision if the parties viewed party arbitrators as mere agents with no vestige of independence. Far from "undisputed" as the Court insists, only Hardy, TUCO's arbitrator, openly advocated violation of Canon V. No party went so far, and certainly not Cole or Beall. A referral among arbitrators simply cannot lead a reasonable person to conclude there is evident partiality. Thus, the award should not be vacated, and certainly not on the ground that Beall merely failed to disclose the referral.

It is telling that virtually all the cases cited by the Court to support its approach deal with relationships between an arbitrator and a party or its counsel. The Court cites no case which vacates an arbitration award due to a business relationship between arbitrators. Significantly, the Court cites one case

which applied an "impression of possible bias" standard similar to the Court's, but held that business referrals between a neutral arbitrator and a party arbitrator *need not be disclosed* when, as in this case, no consideration is given. *San Luis Obispo Bay Properties v. Pacific Gas & Elec. Co.*, 28 Cal.App.3d 556, 104 Cal.Rptr. 733, 741–42 (2nd Dist.1972).

The Court questions my reliance on *San Luis Obispo,* but the line drawn in that case is far clearer than the line drawn by the Court today. The Court purports to hold that the mere failure to disclose a relationship that arises after the arbitration begins is evident partiality as a matter of law. 960 S.W.2d at 637. On the other hand, the Court limits its own holding by noting that the relationship must be "substantial" in order to trigger the disclosure requirement. 960 S.W.2d at 630, 637. The Court neither defines "substantial" nor explains why the referral was substantial in this case. The amount involved in the Mullan case —— $1 million in claims —— certainly appears "substantial." But was Wright's relationship to Beall "substantial?" The Court does not specify whether the value of the case referred or the manner in which the neutral arbitrator met the client renders the relationship "substantial."

The "impression" of partiality standard adopted today will not, as the Court hopes, decrease judicial interference in arbitration. Instead, the focus of litigation will shift from asking courts to review arbitration proceedings for actual bias to arguing over the nuances of relationships between arbitrators.

As a matter of law, the referral from Cole's law firm to Beall created no evident partiality. Accordingly, I would reverse the judgment of the court of appeals and remand the case to that court to consider TUCO's remaining points of error.