SKIDMORE ENERGY, INC., Johnny L. Patton, Jr., Patton Production Company, and Puls, Taylor & Woodson, L.L.P., Appellants,

v.

MAXUS (U.S.) EXPLORATION COMPANY, Appellee.

No. 05–09–00402–CV.

Court of Appeals of Texas, Dallas.

July 12, 2011.

Jeffrey H. Kobs, The Law Offices of Jeffrey H. Kobs, Fort Worth, for Appellants.

Stuart C. Hollimon, Scott A. Brister, Andrews Kurth, LLP, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and FILLMORE.

## OPINION

Opinion By Justice FILLMORE.

In a single issue, appellants Skidmore Energy, Inc. (Skidmore), and Johnny L. Patton, Jr., Patton Production Company, and Puls, Taylor & Woodson, L.L.P. (collectively referred to as Intervenors) contend the trial court erred by entering a judgment confirming an arbitration award that ordered appellants take nothing from appellee Maxus (U.S.) Exploration Company (Maxus). We affirm the trial court's judgment.

## Background

Skidmore and Maxus are oil and gas exploration companies. Maxus is a subsidiary of Repsol YPF. In 1996, Maxus and Skidmore executed a written agreement to jointly evaluate and acquire oil and gas exploration and production rights relating to offshore leases on federal blocks situated in the Gulf of Mexico (the 1996 Contract). Pursuant to the 1996 Contract, Maxus and Skidmore acquired a working interest in seven offshore leases on Green Canyon Blocks 140, 162, 206, and 492, Mississippi Canyon Blocks 491 and 492, and Garden Banks Block 361.

On August 15, 1998, Skidmore and Maxus entered into an agreement to alter their business relationship (the 1998 Agreement). Under the 1998 Agreement, Skidmore agreed to assign all of its rights, titles, and interests in leases on Green Canyon Blocks 140, 162, 206, and 492, and Mississippi Canyon Blocks 491 and 492 to Maxus, and Maxus agreed to pay Skidmore $6,500,000 and to assign all of its rights, title, and interest in the lease on Garden Banks Block 361 to Skidmore. According to the 1998 Agreement, at the time of closing Maxus and Skidmore were to execute assignments of the leases using a form of assignment attached to the 1998 Agreement as Exhibit B. The Exhibit B form of assignment provided that in the event the assignee desired to surrender a lease subject of assignment prior to the expiration of the primary lease term, the

assignee would give the assignor ninety days' notice of its intent to surrender the lease and offer to reassign the lease to the assignor (the notice and reassignment provision).

On August 21, 1998, Skidmore executed six separate assignments in which it assigned all of its interests in the leases on Green Canyon Blocks 140, 162, 206, and 492, and Mississippi Canyon Blocks 491 and 492 to Maxus and Maxus executed an assignment of its interest in the lease on Garden Banks Block 361 to Skidmore. Skidmore retained a three percent overriding royalty interest in the oil and gas produced, saved, and marketed from the leases it assigned to Maxus, and Maxus retained the same overriding royalty interest in the oil and gas produced, saved and marketed from the lease it assigned to Skidmore. The assignments executed by Maxus and Skidmore did not contain the notice and reassignment provision.[1] Each of the assignments stated, "[t]his Assignment is expressly made and accepted subject to the following: ... (2) The terms and provisions of that certain Agreement dated August 15, 1998 between Assignor and Assignee."

In October 1999, Skidmore surrendered the lease on Garden Bank Block 361 before the expiration of its primary term. Skidmore did not provide Maxus prior notice of its intent to relinquish the lease; nor did Skidmore offer to reassign the lease to Maxus. Maxus surrendered its interests in the leases on Green Canyon Blocks 162 and 206 in December 2002, its interests in the leases on Mississippi Canyon Blocks 491 and 492 in June 2002, and its interest in the lease on Green Canyon Block 140 in July 2002. Maxus did not give Skidmore prior notice of its intent to relinquish any of those leases; nor did Maxus offer to reassign any of those leases to Skidmore.

In November 2004, Skidmore learned Maxus relinquished its interests in the five leases. Skidmore notified Maxus of Skidmore's contention that Maxus had breached the 1998 Agreement. In May 2005, Skidmore filed suit against Maxus for breaching the terms of the 1998 Agreement by surrendering five of the leases subject of the agreement without giving Skidmore prior written notice of its intention to surrender the leases or providing Skidmore the opportunity to have the leases reassigned to it. Intervenors asserted the same breach of contract claim against Maxus.[2] Maxus asserted affirmative de-

---

**1.** Maxus drafted the 1998 Agreement, Exhibit B, and the assignments of the seven leases.

**2.** Intervenors are not parties to the 1998 Agreement and have not been assigned any part of the 1998 Agreement. Intervenors assert their claim against Maxus based upon a settlement reached between Skidmore and Intervenors in litigation Intervenors filed against Skidmore and Maxus, *J.L. Patton, Jr. and Patton Production Corporation v. Skidmore Energy, Inc., Skidmore Energy Nevada, L.L.C., Michael H. Gustin, John Paul DeJoria, YPF Holdings, Inc., Maxus Energy Corporation, and Maxus (U.S.) Exploration Co.,* No. 048–187641–01, 48th Judicial District Court, Tarrant County, Texas (2001 Fort Worth litigation). Pursuant to the settlement, Intervenors acquired an undivided one-third of Skidmore's overriding royalty interests in the surrendered leases. According to Intervenors, that "essentially" gave Intervenors a one-third interest in any recovery by Skidmore against Maxus in the litigation and arbitration that is the subject of this appeal. Maxus contends that the settlement agreement between Skidmore and Intervenors does not contemplate any assignment to Intervenors of an interest in the 1998 Agreement and, instead, only gives Intervenors rights against Skidmore for a portion of any proceeds received by Skidmore in connection with the overriding royalty interests. The viability of Intervenors' claim against Maxus is not before this Court, and we express no opinion with regard to the viability of that claim.

fenses of waiver, estoppel, and limitations, as well as a counterclaim for declaratory judgment that Maxus was not obligated to provide Skidmore notice and an opportunity to request reassignment prior to the relinquishment of any of the assigned leases.

Pursuant to a written arbitration agreement entered into after the lawsuit was filed, Skidmore, Intervenors, and Maxus submitted the claims asserted in the lawsuit to binding arbitration.[3] A majority of the three-member arbitration panel entered an award in favor of Maxus. Skidmore and Intervenors moved to vacate the award on the grounds that (1) two of the arbitrators, Martin McNamara and Shannon Ratliff, failed to make necessary pre-arbitration disclosures, and (2) the arbitration panel majority exceeded its authority. Maxus moved for judgment confirming the panel's award. The trial court denied the motion to vacate the arbitration award and signed a judgment confirming the award. Skidmore and Intervenors appeal the trial court's judgment confirming the arbitration award.

### Standard of Review

We review the trial court's confirmation of an arbitration award de novo, based on a review of the entire record. *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 567 (Tex.App.-Dallas 2008, no pet.). Arbitration of disputes is strongly favored under both federal and Texas law. *Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex.1995) (orig. proceeding). Arbitration awards are entitled to great deference by the courts. *Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 429

(Tex.App.-Dallas 2004, pet. denied). "In Texas, review of arbitration awards is extraordinarily narrow." *Hisaw & Assocs. Gen. Contractors, Inc. v. Cornerstone Concrete Sys., Inc.*, 115 S.W.3d 16, 18 (Tex. App.-Fort Worth 2003, pet. denied). An arbitration award has the same effect as a judgment of a court of last resort and all reasonable presumptions are indulged in favor of the award. *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex.2002). The award is conclusive on the parties as to all matters of fact and law. *Centex/Vestal v. Friendship W. Baptist Church*, 314 S.W.3d 677, 683 (Tex.App.-Dallas 2010, pet. denied).

### Claim of Arbitrator's Evident Partiality

Appellants contend the trial court erred when it denied the motion to vacate the arbitration award because of arbitrator McNamara's evident partiality. Appellants assert the arbitration award should have been vacated because McNamara failed to disclose material financial and business relationships with Maxus which manifested a reasonable impression of McNamara's partiality.

For an appellate court to have jurisdiction to review an arbitration award, an appellant must allege a statutory or common law ground to vacate the award. *Hisaw*, 115 S.W.3d at 19. The Texas Legislature has decreed that, on application of a party, a court shall vacate an award if the rights of the party were prejudiced by evident partiality of an arbitrator appointed as a neutral arbitrator. TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(2)(A) (West 2011). A neutral arbitrator selected by

---

**3.** Only five of the leases were involved in the arbitration. Maxus never surrendered the lease on Green Canyon Block 492, holding the lease until it expired by its own terms. Prior to the arbitration, the trial court granted summary judgment to Maxus with regard to the lease on Green Canyon Block 492. Skidmore and Intervenors asserted no cause of action against Maxus with respect to the lease on Garden Banks Block 361.

the parties or their representatives exhibits evident partiality if he does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 636 (Tex.1997).[4] The court emphasized that "evident partiality is established from the *nondisclosure itself,* regardless of whether the nondisclosed information necessarily establishes partiality or bias." *Id.* (citing *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)). This standard reflects the supreme court's determination that courts should not undertake evaluations of partiality that are better left to the parties. *TUCO*, 960 S.W.2d at 636. When choosing a neutral arbitrator, the parties must weigh the competing factors of the arbitrator's knowledge and experience against his potential conflicts; parties can only perform that analysis if they have access to all of the information that could reasonably affect the arbitrator's partiality. *Id.* at 635. When disclosure is complete, the parties can make their determination concerning potential bias before the arbitration begins, a process that is more desirable than a court making the determination after an award is in place. *See id.* "While a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure." *Id.* at 637.

### Factual Background

According to the terms of the arbitration agreement entered into by appellants and Maxus, appellants appointed arbitrator Kit Cooke, and Maxus appointed arbitrator McNamara. After the two party-appointed arbitrators were selected, appellants proposed Ratliff as the third arbitrator, and Maxus accepted Ratliff as the third arbitrator.[5] Appellants and Maxus disagree as to whether party-appointed arbitrator McNamara was a neutral arbitrator and, consequently, whether evident partiality is an applicable statutory basis for review of the arbitration award. *See* Tex. Civ. Prac. & Rem.Code Ann. § 171.088(a)(2)(A).

Appellants contend all of the arbitrators, including McNamara, were intended to be neutral arbitrators. Maxus contends that, as its party-appointed arbitrator, McNamara was not intended to be a neutral arbitrator. While there is nothing in the arbitration agreement that expressly indicates the party-appointed arbitrators were to be considered neutral arbitrators, the agreement specifies that "there shall be no ex parte communications at any time by any party or its representative with any of the arbitrators, except that each party may confer with its own party-appointed arbitrator with respect to selection of the third arbitrator." McNamara testified at the hearing on Maxus' motion to confirm the arbitration award that he believed he was a neutral arbitrator.

The arbitration agreement required the arbitrators to disclose all actual or perceived conflicts of interest and business relationships involving the dispute or the parties, including any professional or social relationships, past or present, with any

---

4. The *TUCO* opinion addresses the standard for resolving claims of evident partiality. *See TUCO*, 960 S.W.2d at 632–37. Section 171.088 was enacted and *TUCO* was decided in 1997. Accordingly, we look to Texas authority from that date forward in analyzing appellants' argument of evident partiality.

5. In their motion to vacate the arbitration award, appellants asserted evident partiality of Ratliff as a ground for vacating the arbitration award, despite Ratliff having been proposed by appellants as the third arbitrator. Appellants do not assert evident partiality of Ratliff on appeal.

party or its affiliates, and provide an oath or undertaking of impartiality in accordance with the "Code of Ethics for Arbitrators in Commercial Disputes promulgated by [the] joint committee of the American Arbitration Association and of the American Bar Association" (the AAA Code). The arbitration agreement provided that the arbitrators could have no affiliation or interests with either party and no financial or personal interest in the outcome of the arbitration.

In accordance with the arbitration agreement, McNamara issued disclosures. He stated he had no direct or indirect financial or personal interest in the outcome of the arbitration. In addition to providing information obtained through the computerized conflicts system of the law firm at which he was employed, including information concerning past litigation in which his firm represented a client adverse to Skidmore, McNamara disclosed the following:

> With respect to personal or professional relationships, while I do not believe it would affect my impartiality or independence as an arbitrator, I serve with Roberto Monti as a member of the Board of Directors of Transocean, Inc. Mr. Monti will be leaving that Board when a pending combination closes with Global SantaFe, which is expected to occur before year end. Prior to 2002, Mr. Monti served as CEO of YPF and, after the acquisition of YPF by Repsol, as EVP of Repsol YPF. To my best recollection, I have never had any discussion with Mr. Monti about the business of Maxus (U.S.) or any matters related in any way to the dispute in the present arbitration. To my best recollection, I am not acquainted with anyone else who is or has

been in a position of responsibility with respect to any of the parties here.

McNamara stated his belief that none of the relationships he disclosed would affect his impartiality or independence as an arbitrator.[6] McNamara also signed an oath that he would faithfully and fairly hear, entertain, determine and make an award based upon his review of the law and evidence. He represented that he had "fully and completely made those disclosures that are required under the *Code of Ethics for Arbitrators*," and that apart from those disclosures he was aware of no past or present relationship with the parties or their counsel, whether financial or professional, that required disclosure.

During the course of the arbitration, certain demonstrative exhibits and testimony indicated that drilling equipment owned by Transocean, Inc. (Transocean) had been utilized by Maxus in 1999 in connection with the drilling of a well referred to as "Haymaker" on Green Canyon Block 162, a lease subject of the arbitration. On the third day of the four-day arbitration, Maxus' witness Delmar Rumph testified regarding the length of time required to obtain necessary studies, authorizations, and equipment and to drill a deepwater offshore oil well. Rumph illustrated his point by discussing the twenty-one month period required for planning, permitting and drilling the Haymaker well. In connection with his explanation of this process, Rumph utilized four slides showing a semi-submersible mobile offshore drilling unit (MODU) with the caption "Transocean Amirante Rig" appearing next to the Maxus logo. Rumph explained that Maxus leased the Transocean Amirante MODU from Transocean at a cost of about $150,000 per day. Rumph testified

---

**6.** The trial court found that McNamara's disclosures produced no objection by appellants, even though one of the disclosures was that McNamara's law firm had previously prosecuted a lawsuit against Skidmore.

that Maxus contracted with Advanced Drilling Technologies, Incorporated (ADTI) to drill the Haymaker well utilizing the Transocean Amirante MODU. According to Rumph, a pre-drilling meeting included Maxus, ADTI, and Transocean.

No party or attorney objected or raised a question about McNamara's service as an arbitrator when the slides depicting the Transocean Amirante MODU were shown or when Rumph testified regarding use of the MODU in the context of drilling the Haymaker well. After the arbitration award, appellants asserted evident partiality of McNamara due to his service on the board of directors of Transocean, a company that had done intermittent business with Maxus and its parent company, Repsol YPF. Appellants also asserted after the arbitration award that while McNamara disclosed his membership on the Transocean board of directors, he should also have disclosed that he owned Transocean stock.

McNamara was deposed by appellants in post-award discovery. He indicated that at the time he made his pre-arbitration disclosures, he had no knowledge of any business relationship between Transocean and Maxus or Repsol YPF, but did not initiate an investigation into any relationship Transocean might have with Skidmore or Maxus. McNamara understood at the time of the arbitration that Maxus was a wholly-owned subsidiary of Repsol YPF. He indicated that he did not recall Skidmore or Maxus ever having been mentioned in connection with any Transocean board matter or included in any Transocean list of material clients. He testified that Transocean was and is the largest drilling company in the world with a market capitalization of about fifty billion dollars and a backlog of contracts worth between forty-two and forty-three billion dollars. McNamara would have as-

sumed Transocean had done business with, or could have had some relationship with, almost any company involved in the offshore oil and gas business. However, he thought the potential for Transocean to have had a substantial relationship with a party to the arbitration as remote and not having an affect on him as an arbitrator. McNamara testified that if anyone had a concern about his service as an outside director of Transocean, he would have expected the concern to be raised in response to his disclosures. McNamara indicated that he assumed anyone knowing he was a director of Transocean, a publicly-held company, would have anticipated he owned stock in the company.

McNamara further testified that he was unaware of Transocean's involvement in drilling the Haymaker well until he saw the slides depicting the Transocean Amirante MODU in the arbitration hearing. McNamara did not think there was any point to mentioning again his relationship with Transocean; he assumed all of the parties knew of the Transocean involvement in the drilling of the Haymaker well because the well was drilled on a lease that was jointly held or that had "gone back and forth" between Maxus and Skidmore, and because the information would have been known to the parties by virtue of discovery exchanged in connection with the litigation. McNamara noted that there was no reaction or demonstration of surprise from the parties regarding the slides or Rumph's testimony referencing the Transocean Amirante MODU. Further, he testified that the fact the Transocean Amirante MODU was used in connection with drilling the Haymaker well was not relevant to the principal points being made by Rumph in his arbitration testimony. Rather, McNamara understood the purpose of Rumph's testimony about the Haymaker well was to describe the amount of time required to drill a deepwater offshore

oil well in the Gulf of Mexico. McNamara testified that if he had not already made disclosure of his relationship with Transocean, he might have viewed the need for disclosure at the time of Rumph's testimony differently.[7]

Eric Brown, a senior vice president and general counsel of Transocean was deposed in the post-award discovery. Brown testified that prior to the arbitration, the 1999 Transocean Amirante MODU contract between Transocean and Repsol YPF, the parent of Maxus, would never have been discussed with McNamara in his capacity as an outside director of Transocean. Brown testified that Maxus and Repsol YPF were not significant clients of Transocean in terms of revenue, either at the time of his deposition or at the time of the arbitration in 2007. Brown testified that the compensation Transocean received from Maxus and Repsol YPF from 2003 through 2007 was a relatively small percentage of its total revenues. In 2003, Transocean received compensation from Maxus and Repsol YPF in the amount of $ 2.96 million, which represented 12/100 of 1 percent of Transocean's total revenues. From 2004 through 2006, Transocean received no compensation from Maxus or Repsol YPF. In 2007, Transocean received compensation from Maxus and Repsol YPF in the amount of $8,387,000, of which $779,000 is in dispute, which represented either 12/100 or 14/100 of 1 percent of Transocean's total revenues.

At the hearing of the motion to vacate the arbitration award, Kelly Puls, attorney for Intervenors, testified that he was aware from McNamara's disclosures that McNamara was on the board of directors of Transocean. He testified that he would never have agreed to an arbitrator who had a financial and business relationship with Maxus or Repsol YPF. When questioned about a 1999 email regarding the status of the Haymaker well, Puls confirmed that the Maxus arbitration exhibit was also designated as appellants' exhibit. That exhibit referenced ADTI finalizing the MODU contract with Transocean, and a meeting to be conducted with "ADTI, Transocean, and YPF–Maxus" personnel. Puls confirmed he knew before arbitration that a contractor used by Skidmore and Maxus had rented the Transocean Amirante MODU. When McNamara disclosed that he was a director of Transocean and Puls realized that Transocean had done business previously with Maxus, it did not concern Puls because he thought the business relationship was remote in time. Puls, who was also the attorney who filed the 2001 Fort Worth litigation, acknowledged that discovery produced by Maxus in that litigation indicated Maxus and Transocean had a business relationship.

In support of their motion to vacate the arbitration award, appellants also elicited testimony from Richard Faulkner as a tendered expert. Faulkner testified he has been active in the arbitration field for thirty years. In Faulkner's opinion, based on the AAA Code, McNamara did not make the disclosures that were required of a neutral arbitrator. Faulkner acknowledged that no statute in Texas codifies or incorporates the AAA Code, and that the

---

7. In his pre-arbitration disclosures, McNamara specifically referenced a Transocean merger with Global SantaFe that was expected to occur before the end of 2007. As McNamara understood the situation at the time of his deposition, ADTI, the drilling contractor for the Haymaker well referenced by Rumph in his arbitration testimony, was a subsidiary or an affiliate of Global SantaFe. However, McNamara testified that he was not aware of that information prior to the closing of the Global SantaFe merger in November 2007, which took place between the close of the evidence in the arbitration proceeding and the rendering of the arbitration award.

code is aspirational for arbitrators conducting arbitrations in Texas.[8]

Faulkner was aware of McNamara's testimony that he did not know of any business relationship between Transocean and Maxus or Repsol YPF when he was appointed as an arbitrator. Faulkner acknowledged he had not seen anything that indicated knowledge on the part of McNamara concerning a relationship between Transocean and Maxus or Repsol YPF. Faulkner acknowledged that appellants did not ask for additional information from McNamara based on his disclosures and that, based on their knowledge of the prior business relationship between Transocean and Maxus or Repsol YPF, appellants could have objected to McNamara as an arbitrator at the time of his appointment. Faulkner acknowledged that McNamara could not disclose what he did not know, but Faulkner stated that he would expect McNamara, as a member of the board of directors of Transocean, to make a reasonable inquiry of the company before serving as an arbitrator and to ascertain whether or not the company was involved directly or indirectly with a party to the arbitration. Despite appellants' knowledge of Transocean's business relationship with Maxus/Repsol YPF based on the discovery in the 2001 Fort Worth litigation and appellants' designated exhibits in the arbitration, Faulkner stated that McNamara had a continuing duty to disclose a business relationship between Transocean and Maxus or Repsol YPF at the time the slides were presented by Rumph depicting the Transocean Amirante MODU used in connection with drilling the Haymaker well.

*Findings of the Trial Court*

The trial court found that even if appellants were deemed to have asserted statutory grounds for vacating an arbitration award, appellants failed to establish those grounds, including the ground of evident partiality.[9] In addition to its finding of fact that arbitrator McNamara was not evidently partial and its conclusion of law that Skidmore failed to establish evident partiality as to McNamara, the trial court signed the following findings of fact:

15. Prior to the arbitration, Mr. McNamara disclosed that he serves on the Board of Directors of Transocean, Inc. ("Transocean"), a public company not involved in this lawsuit. He also disclosed that Robert Monti, a former officer of Maxus' parent company, Repsol YPF, also served on that Board. [Skidmore] and Intervenors did not object to Mr. McNamara despite these disclosures. Now, however, [Skidmore] and Intervenors complain that Mr. McNamara's failure to disclose his stock ownership in Transocean and his failure to disclose that Transocean has done business with Repsol YPF establish his evident partiality. Prior to the arbitration hearing, however, Mr. McNamara had no knowledge of any business relationship between Transocean and either Repsol YPF or Maxus, and had no

---

8. Having cited no legal authority to support their contention the arbitration award should be vacated because of McNamara's alleged violation of the AAA Code, the trial court found appellants waived that alleged ground for vacating the arbitration award. On appeal, appellants cite no legal authority to support their claim that an alleged violation of the AAA Code is a basis for vacating the arbitration award.

9. More specifically, the trial court found that "[w]ith respect to the two arbitrators in question, Mr. Shannon Ratliff and Mr. Martin McNamara, the evidence failed to establish evident partiality as to either of them. In addition and in the alternative, the evident partiality standard does not apply to Mr. McNamara at all because he was a party-appointed arbitrator, not a 'neutral' arbitrator within the meaning of Section 171.088."

knowledge of any connection between Transocean and the leases involved in this case.

16. [Skidmore] and Intervenors also complain that during the course of the arbitration hearing certain demonstrative exhibits were displayed that indicated Transocean had been the drilling contractor on a well drilled for Maxus in 1999 on one of the Federal Leases in this case, and that this should have caused Mr. McNamara to make a disclosure at that time of a possible business relationship between Transocean and Maxus. However, [Skidmore] and Intervenors were equally aware of the demonstrative exhibits and their implications, but did not object or raise any question relating to Mr. McNamara's continued service as an arbitrator. Moreover, at the hearing on the motion to vacate and the motion for judgment confirming arbitration award, the evidence established that [Skidmore] and Intervenors and their counsel had been aware of these facts for several years.

Appellants have not raised specific challenges to the trial court's findings of fact. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986) (When findings of fact are filed and unchallenged, they occupy same position and are entitled to the same weight as the verdict of a jury. They are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.). Appellants assert, however, that evident partiality of McNamara warranted the trial court's vacating the arbitration award. We will construe that argument as attacking the trial court's findings of fact that arbitrator McNamara was not evidently partial.

### Analysis

On application of a party, a court shall vacate an award if the rights of the party were prejudiced by evident partiality of an arbitrator appointed as a neutral arbitrator. TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(2)(A). The arbitration agreement of the parties does not explicitly indicate that the party-appointed arbitrators were to be considered neutral arbitrators. However, the arbitration agreement specifies that "there shall be no ex parte communications at any time by any party or its representative with any of the arbitrators, except that each party may confer with its own party-appointed arbitrator with respect to selection of the third arbitrator." McNamara testified he believed he served in the capacity of a neutral arbitrator. While the trial court did not find that McNamara was a neutral arbitrator, the court's findings of fact nevertheless addressed appellants' contention of evident partiality on the part of McNamara. Assuming, without deciding, that McNamara was a neutral arbitrator, we likewise address appellants' contention of evident partiality on the part of McNamara under applicable law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.088; *TUCO,* 960 S.W.2d at 636.

Appellants suggest McNamara had an undisclosed interest in the arbitration because Transocean, on whose board of directors McNamara served, had a business relationship with Maxus/Repsol YPF, and McNamara owned Transocean stock. McNamara served as an outside director on the board of Transocean, a company that had, unknown to McNamara at the time of his disclosures, done intermittent business with Maxus and its parent Repsol YPF. It is undisputed that appellants and their counsel had been aware for years prior to the arbitration that Maxus had done business with Transocean, including contracting with Transocean to utilize the Transocean Amirante MODU in connection with drilling the Haymaker well on

one of the leases at issue in the arbitration. Despite the fact appellants had actual knowledge of the prior business dealings between Transocean and Maxus/Repsol YPF, appellants made no objection upon receipt of McNamara's disclosures or during the arbitration when the evidence referred to those business dealings. Further, as pointed out by Maxus, information concerning McNamara's ownership of Transocean stock, as a member of its board of directors, was publicly available in Transocean's periodic filings with the United States Securities and Exchange Commission and appellants were capable of obtaining that information at the time McNamara made the disclosure of his relationship with Transocean. Again, appellants made no objection upon receipt of McNamara's disclosures or during the arbitration concerning McNamara's Transocean stock ownership.

■ Appellants did not raise an objection of evident partiality of arbitrator McNamara until after the arbitration award by the panel majority. A party who knows or has reason to know of an arbitrator's alleged bias but remains silent pending the outcome of the arbitration waives the right to complain. *Bossley v. Mariner Fin. Grp., Inc.*, 11 S.W.3d 349, 351–52 (Tex.App.-Houston [1st Dist.] 2000), *aff'd*, 79 S.W.3d 30 (Tex.2002). "A party may not sit idly by during an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrator when the result turns out to be adverse." *Bossley*, 11 S.W.3d at 351–52 (citing *Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 232 (Tex.App.-Houston [14th Dist.] 1993, writ denied)); *see also Myer v. Americo Life, Inc.*, 315 S.W.3d 72, 76 (Tex.App.-Dallas 2009, pet. filed); *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 806 (Tex.App.-Austin 2004, pet. denied) (having elected to proceed

with arbitration in face of their knowledge regarding arbitrator, parties could not later complain after arbitration award). "[A] party who learns of a conflict before the arbitrator issues his or her decision must promptly object to avoid waiving the complaint." *TUCO*, 960 S.W.2d at 637 n. 9; *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 806 (Tex.App.-Dallas 2007, pet. denied). We agree with the trial court that appellants have waived their complaint concerning McNamara's alleged evident partiality by failing to raise the issue prior to issuance of the arbitration award.

■ But even if appellants had not waived their complaint, we conclude based upon the entirety of this record that McNamara did not fail to disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *See TUCO*, 960 S.W.2d at 636. McNamara properly disclosed at the outset of the arbitration that he served on the Transocean board of directors. The undisputed evidence is that McNamara was unaware of an intermittent business relationship between Transocean and Maxus/Repsol YPF at the time he made his pre-arbitration disclosures. At the point during the arbitration that McNamara viewed demonstrative exhibits and heard testimony concerning a business relationship between Transocean and Maxus/Repsol YPF, it was apparent that the parties to the arbitration were aware of the business relationship. The intermittent business relationship between Transocean and Maxus/Repsol YPF produced compensation to Transocean that constituted no more than a very small portion of Transocean's annual revenue in 2003 and 2007. The trial court properly concluded that appellants' failed to establish evident partiality of McNamara. We conclude the trial court did not err in confirming the

arbitration award in favor of Maxus and in denying appellants' motion to vacate the arbitration award based on appellants' claim of arbitrator McNamara's evident partiality. We overrule appellants' argument to the contrary in their sole issue.

### Claim That Arbitrators Exceeded Their Powers

Appellants additionally contend the trial court erred by entering a judgment confirming the arbitration award because the panel majority exceeded its authority. Appellants claim the panel majority exceeded its authority by ruling that Skidmore breached the 1998 Agreement because that specific argument was not advanced by Maxus at the outset of the arbitration.

#### Factual Background

At arbitration, it was undisputed that, although the parties had agreed that prior notice of an intention to relinquish an assigned lease and an opportunity to request reassignment of the lease would be given, the actual assignments that were prepared by Maxus and executed by Maxus and Skidmore did not contain a notice and reassignment provision. At the conclusion of the first day of the four-day arbitration hearing, arbitrator Ratliff asked if any party was contending that the preparation, execution, and delivery of assignments

without the required notice and reassignment provision was a breach of contract. Counsel for the parties confirmed that no party was making the contention that a breach of contract occurred at the time of execution of the lease assignments.

In its arbitration award, the panel majority concluded that by delivering at the August 21, 1998 closing the lease assignments that omitted the notice and reassignment provision, Skidmore and Maxus breached the 1998 Agreement. The panel majority noted that it was uncontroverted that Skidmore did not file the breach-of-contract suit against Maxus within four years of the closing. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (West 2008) (residual four-year statute of limitations); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (statute of limitations for breach of contract is four years and breach of contract claim accrues when contract is breached). The panel majority found that Skidmore committed a material breach of the 1998 Agreement, and that Skidmore was estopped from enforcing the 1998 Agreement.[10]

Appellants contend that in their pleadings neither Skidmore nor Maxus asserted, as a claim or as an affirmative defense, that a breach of contract occurred on the closing date when the lease assignment

10. Alternatively, the panel majority found that by closing on lease assignments that did not contain the notice and reassignment provision, Skidmore waived any right to insist on Maxus' compliance with that provision. Maxus argues that on appeal, appellants do not challenge the arbitrators' waiver finding, and it stands as an independent ground supporting the award. Appellants do not assert on appeal that the affirmative defense of waiver was not before the arbitrators. Appellants respond that challenging the arbitrator's award on the basis of waiver would be tantamount to asserting the arbitrators incorrectly decided an issue, which is not a

ground for vacating an arbitration award under the Texas Arbitration Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.088; *Jamison & Harris v. Nat'l Loan Investors*, 939 S.W.2d 735, 737 (Tex.App.-Houston [14th Dist.] 1997, writ denied) (alleged error in application of substantive law by arbitrator not reviewable by a court on a motion to vacate arbitration award). Because we disagree with appellants' contention that the panel majority exceeded its powers, we need not address Maxus' contention that appellants failed to challenge an independent ground supporting the arbitration award. *See* TEX. R.APP. P. 47.1.

forms were executed in a form different from that agreed upon in the 1998 Agreement. Appellants argue that because the issue of when the breach of contract occurred was not a claim or defense asserted in the lawsuit, and the arbitration award is at odds with the statements by counsel on the record that no one contended a breach of contract occurred at the closing of the lease assignments, the panel majority exceeded its authority in ruling on the matter.

*Findings of the Trial Court*

The trial court found that in the litigation underlying the arbitration, "Skidmore alleged that Maxus breached [the notice and reassignment] requirement with respect to six leases. By alleging that Maxus breached the Agreement and that Skidmore performed its obligations under the Agreement, Plaintiff and Intervenors placed Skidmore's performance of that Agreement at issue." Further, the trial court signed the following specific findings of fact:

> 19. In this case, the parties' written Arbitration Agreement encompassed "all claims asserted in the Lawsuit." Plaintiff and Intervenors claim on the merits was that Maxus breached the parties' 1998 Agreement by surrendering certain Federal Oil and Gas Leases without first giving Skidmore notice and an opportunity to request reassignment. In its Answer, Maxus denied the claim and further contended that Plaintiff and Intervenors' claims were barred by waiver, estoppel and limitations.

> 20. The parties Arbitration Agreement encompassed the question of whether Skidmore first breached the parties' agreement and had waived or was thereby estopped from pursuing its claims against Maxus. The matter was raised as an affirmative defense in Maxus' Answer and was discussed during the actual arbitration proceedings.

> 21. The Panel Majority concluded that by delivering Assignments at closing that omitted the notice and reassignment clause, Skidmore had itself breached the Agreement by failing to deliver Assignments on the proper form. Having committed a material breach of the Agreement, the Panel Majority held that Skidmore was estopped from enforcing the Agreement. In the alternative, the Panel Majority found that by closing on Assignments that did not contain the notice and reassignment provision, Skidmore waived any right to insist on Maxus' compliance with that provision. Estoppel and waiver were both pleaded by Maxus.

As indicated previously in this opinion, appellants have not raised specific challenges to the trial court's findings of fact. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986). Appellants assert, however, that action by the arbitration panel majority exceeded the panel's powers. We will construe that argument as attacking the trial court's findings of fact that the panel majority did not exceed its powers.[11]

> [Skidmore] and Intervenors argued exceeded the Arbitrators' authority. Because the alternate ground of the Award (waiver) was not challenged at all, the record provides no basis on which to vacate the Award as exceeding the Arbitrators' authority.

**11.** The trial court's findings of fact and conclusions of law includes the following support for the trial court's denial of appellants' motion to vacate the arbitration award and for entry of judgment confirming the arbitration award:

> 4. ... [T]he Panel's Award is based on alternative grounds, only one of which

## Analysis

Texas law allows for vacatur of an arbitration award if the arbitrators "exceeded their powers." TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(3)(A). An arbitrator's authority is limited to disposition of matters expressly covered by an arbitration agreement or implied by necessity. *Gulf Oil Corp. v. Guidry,* 160 Tex. 139, 327 S.W.2d 406, 408 (Tex.1959); *see also Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 90 (Tex.2011) (in arbitration conducted by agreement of the parties, rule is well established that an arbitrator derives his power from parties' agreement to submit to arbitration) (citing *City of Pasadena v. Smith,* 292 S.W.3d 14, 20 (Tex.2009)); *Townes Telecomms. Inc. v. Travis, Wolff & Co.,* 291 S.W.3d 490, 493 (Tex.App.-Dallas 2009, pet. denied) (arbitrator's authority to decide matters is derived from the arbitration agreement). Arbitrators therefore exceed their authority when they decide matters not properly before them. *Travis, Wolff & Co.,* 291 S.W.3d at 493. When determining whether an arbitration panel has exceeded its powers, any doubts concerning the scope of what is arbitrable should be resolved in favor of arbitration. *Id.*

When we determine whether claims are within the scope of an arbitration agreement, we examine the terms of the arbitration agreement and the factual allegations pertinent to the claim. *Graham–Rutledge & Co. v. Nadia Corp.,* 281 S.W.3d 683, 690 (Tex.App.-Dallas 2009, no pet.). Because of policy favoring enforcement of arbitration agreements, the ability to arbitrate claims should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would

cover the dispute at issue." *Marshall,* 909 S.W.2d at 899 (quoting *Commerce Park at DFW Freeport v. Mardian Constr. Co.,* 729 F.2d 334, 338 (5th Cir.1984)).

Here the arbitration agreement reflects the parties' desire to submit "all claims asserted in the Lawsuit" to binding arbitration.[12] This phrase is broad and may encompass a wide range of issues. *See Centex/Vestal,* 314 S.W.3d at 685 (noting that "[a]ny claim arising out of or related to the Contract" was subject to arbitration was broad and encompassed a wide range of disputes). When an arbitration clause employs broad language such as the language in the arbitration agreement here, "it is construed as evidencing the parties' intent to be inclusive rather than exclusive." *Id.* Broad arbitration agreements like that at issue have been held to support awards rendered on a variety of grounds, including those not specifically argued to the arbitrators. *See City of Baytown v. C.L. Winter, Inc.,* 886 S.W.2d 515, 518 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (arbitrators did not exceed powers by awarding damages for changed conditions under contract even though issue of changed conditions was not specifically addressed in parties' briefing); *J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co.,* 927 S.W.2d 31, 34–5 (Tex.App.-Houston [1st Dist.] 1995, no writ) (arbitrators did not exceed their powers in determining issue the resolution of which was not expressly demanded, because issue was actually discussed during arbitration proceedings).

In their motion to vacate the arbitration award, appellants stated that "at the arbitration and pursuant to the terms of the Arbitration Agreement, the arbitrators

---

**12.** The arbitration agreement also provides that the "arbitrators may grant or deny any remedy or relief in their final award as they deem just and equitable, including, but not limited to, an award to either side of its attorneys' fees and costs."

were to undertake a 'clarification of the issues.' " The arbitration agreement further provides that in exercising their discretion, the arbitrators "may direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case." Here, the parties were requested to advise the arbitrator whether either party took the position that the 1998 Agreement had been breached at the time of the closing of the lease assignments.

■ Appellants contend Maxus stipulated that no party to the arbitration argued a breach of contract occurred when the lease agreements were executed. Appellants argue that the stipulation is dispositive on the question of whether the panel majority exceeded its powers. We disagree. The arbitrator was attempting to clarify a dispositive legal issue and the statement of Maxus regarding its position on that legal issue was not binding on Maxus or the arbitrators.[13] The question of when a cause of action accrues is a question of law, not fact. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 567 (Tex.2001). Stipulations as to legal conclusions, as opposed to facts, are not binding on courts or parties. *Caprock Inv. Corp. v. Fed. Deposit Ins. Corp.*, 17 S.W.3d 707, 713 (Tex.App.-Eastland 2000, pet. denied); *see also Fid. & Cas. Co. of N.Y. v. Horton & Horton Custom Works, Inc.*, 462 S.W.2d 613, 618 (Tex. Civ.App.-Fort Worth 1971, writ ref'd n.r.e.) (since question of law would be involved, stipulation could not have operated to control the court and prevent finding on facts which might, when applicable law and legal principles were applied, compel conclusion); *Humble Oil & Refining Co. v. Sun Oil Co.*, 191 F.2d 705, 714 (5th Cir.1951) (citing *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 785 (Tex.Com.App.1928)) (adoption of the principle by Supreme Court of Texas "that expressions of opinions as to the law of the case by counsel are not binding upon either his client or the court").[14]

Skidmore's claim is that Maxus breached the parties' 1998 Agreement by surrendering five oil and gas leases without first giving Skidmore notice and an opportunity to request reassignment of the leases.[15] In its answer, Maxus denied the claim and contended Skidmore's claims were barred by waiver, estoppel, and limitations. The parties' arbitration agreement encompassed the question of whether Skidmore breached the parties' agreement and was thereby estopped from pursuing its claim against Maxus. The matter was raised as an affirmative defense in Maxus' pleadings and discussed during the actual arbitration proceedings. In its statement of the case submitted in advance of the arbitration hearing, Maxus stated that whether Skidmore's claims are barred, in whole or in part, by the affirmative defenses of waiver, estoppel and the statute of limitations were issues in the case.

The arbitrators stated the arbitration proceeding would not be closed until the parties provided their closing memoranda. Arbitrator Ratliff, again, raised the legal

---

**13.** In their motion to vacate the arbitration award, appellants acknowledged that the question of when a breach of contract occurs is a question of law.

**14.** With regard to whether the 1998 Agreement is unambiguous, Arbitrator Ratliff stated that the arbitrators are free to ignore the parties' stipulation on a legal issue. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983) (question of whether a contract is ambiguous is a question of law).

**15.** Skidmore made the allegation notwithstanding the fact that Skidmore did not give Maxus prior notice of Skidmore's intention to relinquish the Garden Banks Block 361 lease.

issue of whether a breach occurred at the time of the closing of the lease assignments when non-conforming assignments were delivered, a matter the parties could address in their closing memoranda. In its closing memorandum to the arbitrators, Maxus addressed the issue of whether a breach of the 1998 Agreement occurred at closing:

> Maxus contends that there was no breach at the August 21, 1998, closing because . . . each party had the option at closing of either (i) insisting that the other party present an assignment of the lease(s) using the Exhibit B form, failing which that party could refuse to close, or (ii) waiving the condition and accepting the tendered Assignments. Because the parties closed without insisting on delivery of the Exhibit B form of Assignment, Maxus contends that the use of that form was waived and that the failure to deliver Assignments on that form was therefore not a breach of the Agreement.
>
> If, as Skidmore and Intervenors contend, however, the parties did not waive the use of the Exhibit B form of assignment, then the alternative is that they were still insisting on the use of that form, and since neither party delivered assignments on the Exhibit B form, the Agreement was breached at that point.
>
> *    *    *
>
> In summary, then, Skidmore and the Intervenors can pick their poison—either Skidmore waived the use of the Exhibit B form of assignment, in which case it has no claim under the "notice and reassignment" clause that appears only in that form, or the Agreement was breached by the delivery of the wrong form of assignment at closing, in which case all claims are barred by limitations.

Appellants asserted in the lawsuit against Maxus that Maxus breached the 1998 Agreement and that Skidmore performed its obligations under the agreement. The affirmative defenses asserted by Maxus—waiver, estoppel, and limitations—were before the arbitration panel. The questions of whether and when there was a breach of the 1998 Agreement were before the arbitration panel. *See Centex/Vestal*, 314 S.W.3d at 686 (party cannot submit issue to arbitration panel and then, when unfavorable result occurs, claim arbitrators exceeded their authority in deciding the issue).

We conclude the arbitrators decided matters that were properly before them and did not exceed their powers. We overrule appellants' argument to the contrary.

### Conclusion

We overrule appellants' sole issue. We affirm the trial court's judgment.