PONDEROSA PINE ENERGY, LLC, Appellant

v.

TENASKA ENERGY, INC., Tenaska Energy Holdings, LLC, Tenaska Cleburne, LLC, Continental Energy Services, Inc., and Illinova Generating Co., Appellees.

No. 05–10–00516–CV.

Court of Appeals of Texas, Dallas.

Aug. 20, 2012.

Michael W. Huddleston, Shannon, Gracey, Ratliff & Miller, L.L.P., Dallas, TX, B. Frank Cain, Shannon, Gracey, Ratliff & Miller, L.L.P., Fort Worth, TX, Gregory S. Coleman, Marc S. Tabolsky, Edward C. Dawson, Ryan P. Bates, Reagan W. Simpson, Yetter Coleman, LLP, Austin, TX, for Appellant.

Howard I. Close, Patrick McAndrew, Wanda McKee Fowler, Wright & Close, LLP, Houston, TX, Mike A. Hatchell, Locke Lord Bissell & Liddell LLP, John J.

Mcketta, III, Graves Dougherty Hearon & Moody, William W. Dibrell, Graves Dougherty Hearon & Moody, Austin, TX, Bryce Quine, Bradley C. Knapp, Locke Lord Bissell & Liddell LLP, Bradley C. Weber, Carmen S. Mitchell, Mitchell, Goff & Mitchell, LLP, Deborah G. Hankinson, Dallas, TX, for Appellees.

Before Justices BRIDGES, FRANCIS,[1] and LANG.

## OPINION

Opinion By Justice LANG.

Ponderosa Pine Energy, LLC, appeals the trial court's order vacating a $125 million arbitration award in its favor on the ground of one arbitrator's evident partiality. In a single issue, Ponderosa contends the trial court's ruling is error because the arbitrator disclosed relationships with the parties and their counsel sufficient to put appellees on notice of the facts giving rise to what they now contend is a reasonable possibility of partiality and, despite having the opportunity, appellees did not object or seek additional information about those relationships. After reviewing the record and considering the applicable law, we agree with Ponderosa. Accordingly, we reverse the trial court's order vacating the award and render judgment confirming the arbitration award.

### I. Factual and Procedural Context

This controversy arose out of the sale of a Cleburne, Texas electric-generating power plant to Ponderosa by appellees Tenaska Energy, Inc., Tenaska Energy Holdings, LLC, Tenaska Cleburne LLC, Continental Energy Services, Inc., and Illinova Generating Co. The purchase

---

**1.** Chief Justice Wright substituted in for Justice Francis at oral argument only. Justice Francis has read the briefs, listened to the recording of the oral argument, and reviewed the record.

agreement contained a broad arbitration clause requiring the parties to arbitrate any dispute arising out of or related to the agreement. It called for arbitration before a panel of three arbitrators, one designated by each party and a third selected by the two designated arbitrators. The agreement also called for arbitration to be conducted under American Arbitration Association (AAA) rules, but without AAA administration. Finally, it contained a "baseball arbitration" provision whereby each party was to submit a proposed settlement, and the arbitration panel was then limited to selecting one of the two proposals submitted for the award. The parties agree that the arbitrators were to be neutral.

A dispute arose between the parties over whether appellees were required to indemnify Ponderosa for breaching representations and warranties under the purchase agreement. On June 23, 2006, Ponderosa filed a statement of claim demanding arbitration and asserting indemnity rights of more than $200 million. Ponderosa was represented by Frank Penski and Constance Boland of the New York law firm Nixon Peabody LLP. In accordance with the purchase agreement's arbitration clause, Ponderosa advised appellees in writing on June 27 that it had designated Samuel A. Stern, a Washington, D.C. lawyer with Hills & Stern LLP, as arbitrator. Ponderosa attached Stern's eight-page CV, which showed among other things that he had served as assistant counsel to the Warren Commission and was previously a partner at Wilmer, Cutler & Pickering in Washington, D.C., for twenty-six years. Additionally, his CV showed he had an international and corporate practice with emphasis on foreign investment and trade, corporate governance, structuring and project financing of ventures in emerging and transitional countries, licensing and distribution arrangements, and international commercial arbitration. In addition to advising more than twenty foreign governments on project-finance issues, he was a director of several close companies "with various involvements" in the Third World, including an Indian company, Lexsite.com. On August 2, 2006, five weeks after Ponderosa designated Stern, Penski provided appellees with Stern's disclosure statement describing "all" of his contacts with Nixon Peabody. In the statement, Stern disclosed the following:

> In February 2002, I was appointed an arbitrator by the claimant in an AAA arbitration. Nixon Peabody represented the claimant. The panel issued a final arbitration award in favor of claimant. Thereafter, I understand that the case settled.

> On May 3, 2006, I participated in a general discussion at the Nixon Peabody offices on the possible outsourcing of certain discovery tasks in litigation. I attended as a member of the Advisory Board of Lexsite, an Indian company which provides support to legal publishers, corporations, and law firms. Nixon–Peabody and Lexsite have done no business, and it is not clear that Nixon–Peabody would ever have any business to give Lexsite.

> On June 19, 2006, I was appointed an arbitrator by the respondent, on the recommendation of Nixon Peabody, in *J3 Technologies Corporation v. Dynamics Research Corporation.* This has not commenced.

> On June 26, 2006, I was appointed an arbitrator by claimant, on the recommendation of Nixon Peabody, in *Ponderosa Pine Energy, LLC v. Tenaska Energy.*

> On July 12, 2006, I was appointed an arbitrator by the claimant, on the rec-

ommendation of Nixon–Peabody [sic], in Ada Co. Generation Limited.

Appellees did not seek additional information on the contacts disclosed. However, the next day they responded by letter seeking other information:

Mr. Stern's disclosure statement is not sufficient. While it reveals his prior and current contacts with Nixon Peabody, Mr. Stern's statement says nothing about his contacts or relationships with any of the parties or their representatives (except your firm). Rule R–16 of AAA's Commercial Arbitration Rules requires that any person appointed an arbitrator shall disclose any circumstance likely to give rise to justifiable doubt about the arbitrator's impartiality or independence, including, among other things, "any past or present relationship with the parties or their representatives …" Given Mr. Stern's extensive experience in the fields of international finance and foreign investment and trade, it is not unreasonable to think he had or has contacts and/or relationships with some of the other parties here, including in particular the bank entities that now own [Ponderosa].

Please ask Mr. Stern to prepare and submit a comprehensive and compliant disclosure statement.

In response, Stern filed a supplemental statement in which he said he had "no professional or other relationship" with sixteen listed financial institutions and companies that had some connection to the underlying sale of the Cleburne plant. Thereafter, Stern and appellees' designated arbitrator, Thomas S. Fraser, selected the late Honorable James A. Baker, retired Texas Supreme Court justice, as the third arbitrator. Justice Baker ultimately served as panel chair.

Early in the process, the parties appeared at a preliminary conference that resulted in a scheduling and procedural order for the arbitration. The order prohibited any ex parte communications with any member of the panel on or after September 22, 2006, and set the dates for the evidentiary hearing. Additionally, at the urging of Justice Baker, the order contained a waiver of conflicts provision in which the parties and the arbitrators confirmed that they "(i) fully disclosed all conflicts of interest and potential conflicts of interest, with respect to the designation of the members of the panel in this Arbitration; and (ii) knowingly waive any and all conflicts of interest and/or potential conflicts of interest, relating to the designation of the members of the Panel in this Arbitration." The parties then engaged in extensive discovery and, as required by the purchase agreement, submitted settlement proposals. Ponderosa submitted a settlement amount of $125 million, and appellees cumulatively submitted an amount of $1.2 million.

The hearing began in March 2007. The panel heard five days of testimony. Ponderosa presented three fact witnesses, two damages experts, a project finance expert, and lead counsel on attorney's fees. Appellees presented three fact witnesses and a damages expert. On May 7, 2007, the panel issued a twenty-three-page opinion and award in Ponderosa's favor. The 2–1 decision, with Fraser dissenting, concluded that appellees breached warranties in the purchase agreement and awarded Ponderosa the "baseball amount" of $125 million. On the day the opinion issued, Ponderosa filed a petition to confirm the award in state district court.

That same month, after the opinion and award issued, appellees hired an international private investigation firm to investigate Stern. Thereafter, they filed motions to vacate the award alleging, among other things, that while all three arbitrators

were supposed to be "impartial in every respect and free from bias," Stern was neither. In an amended motion, appellees asserted that Stern's disclosure statement, which appellees alleged was edited by Nixon Peabody lawyers Penski and Boland, omitted material facts. In part, appellees complained that (1) Stern failed to disclose that his contacts with Nixon Peabody, a 700–lawyer firm, were with Penski and Boland, personally, and that he permitted them to "direct what he did and did not disclose to the defendants"; (2) at Stern's urging and initial participation, Penski and Boland had contemporaneous business discussions on behalf of Nixon Peabody with Lexsite, an Indian litigation support company in which Stern had a "direct and continuing financial interest, going so far as to promise that those discussions would 'continue' immediately after this arbitration concluded"; and (3) in a prior arbitration, Stern was appointed by Penski for a Nixon Peabody client, Ada Co–Generation, that was owned by Delta Power Co. LLC, a company that previously owned Ponderosa and had been "a key player in the events giving rise to this dispute, and whose principals were important witnesses for [Ponderosa] in this arbitration hearing[.]"

The trial court held a hearing on the motions in December 2007. In addition to more than 400 exhibits, including the depositions of Penski, Boland, and Stern, each side presented an expert on the issue of whether Stern's failure to disclose information was evident partiality. Generally, the evidence showed that while Stern had disclosed relationships with Nixon Peabody and Lexsite, he did not disclose all details of those relationships. In particular, the evidence showed as follows.

Stern testified he became involved in Lexsite at the request of a friend, whose son was one of the investors in the company. After meeting with Ananth Nayak, Lexsite's chief executive officer, he agreed to serve on the advisory board to provide business and legal advice. In exchange, Stern said he was given the "opportunity" to make a "token investment" in Lexsite, which he did by paying $1,300 for about 3,000 shares of Lexsite stock out of 13 million to 14 million outstanding, which he said amounted to less than .04 percent ownership in the company.[2] Later, he was given 10,000 shares of stock options, which he never exercised.[3] He also testified he was never on the board of directors, although his secretary had mistakenly included that information on his CV.

As part of his efforts on behalf of Lexsite, Stern contacted some of his connections in the legal community, including Penski, to introduce Lexsite to U.S. law firms. Penski testified that Stern called him in April 2006, saying he was trying to help a company get started on doing outsourcing work. Penski said before this call, he had not spoken with Stern since 2002, when Stern served as an arbitrator in a case for his client. After the call, Stern introduced Penski to Nayak through email, and then in mid-April, Penski met Nayak in person in the lobby of the Nixon Peabody offices for five to ten minutes. Penski then arranged the May 5th sales meeting with Stern and Nayak referred to

---

2. At the time of his deposition in November 2007, Stern said the stock had "no market value. The—on the most recent financing, they sold shares in a private placement at I think a lower price than I had paid for." Stern said the financing occurred "sometime this year."

3. Stern also testified at his deposition that the options were available to him at a strike price, and "[t]he price at which they had the private placement this year was under the strike price."

in Stern's disclosures, and Stern was copied on emails leading up to that meeting. Penski and Boland were in attendance, as well as fifteen to twenty other Nixon Peabody lawyers. Boland testified that Stern made a "few very brief comments" at the end, and Nayak did most of the talking, describing Lexsite and how it could assist law firms in conducting outsourcing of research by lawyers in India at a "significant cost savings." The meeting lasted about one hour, and Lexsite representatives left optimistic that they would eventually do business with Nixon Peabody. While Penski walked to the elevator after the meeting with Stern and Nayak, Stern suggested that Penski keep him "in mind" if he had "any arbitrations that would be fun."

Shortly after this meeting, during a three-week period between June 19 and July 12, 2006, Stern was appointed as an arbitrator in three different cases on the recommendation of Penski and/or Boland. On June 16, 2006, Penski contacted Stern by email and said he needed a neutral party arbitrator for Penski's client, Ada Co–Generation, which was partially owned by Delta Power Company. (Delta was the parent of Ponderosa prior to the arbitration.) The next morning, Stern responded that he was available and had no conflicts. In the same communication, he mentioned that Nayak would be returning to the United States soon and asked Penski, "Any movement there?" Penski responded that he had spoken with several partners looking for a case in which to try Lexsite but "no luck so far[.]" On July 12, 2006, Stern was appointed arbitrator in the Ada Co–Generation case. On June 19, 2006, on Boland's recommendation, Stern was appointed as arbitrator in the J3 Technologies case. Then, one week later, on June 26, Penski and Boland recruited Stern as arbitrator in this case.

During this same time period, on June 28 and 29, Boland and Nayak exchanged emails about setting up another meeting on Lexsite. After Stern was appointed arbitrator in the two cases in which Penski and Boland served as counsel,[4] Boland testified she told Nayak that Nixon Peabody could not give Lexsite any business, nor could she meet with him, "at least as long as those arbitrations were pending." Nayak asked how long that would take, and Boland said she told him "a long time."

After Stern agreed to arbitrate this case, Boland asked him to draft a "brief disclosure" describing his contacts with Nixon Peabody. She specifically told him to mention the 2002 arbitration and the then pending Ada Co–Generation arbitration. She did not ask him to describe his contacts with her or Penski or to mention their involvement in the recommendations. Boland sent the disclosure, quoted above, to appellees one month later.

Although the statement appeared to be written by Stern alone, evidence showed that Penski and Boland actually made revisions to the statement with Stern's approval. First, they added the last sentence of the second disclosure about the May meeting ("Nixon–Peabody and Lexsite have done no business, and it is not clear that Nixon–Peabody would ever have any business to give Lexsite"). Second, Boland added the entire last disclosure regarding the Ada Co–Generation arbitration, but did not include information that Penski was lead counsel in the case or that Ada Co–Generation and Ponderosa had shared a common parent. Stern testified that he mistakenly omitted this contact.

Stern did not recall ever having a party assist him in preparing a disclosure before this case, but believed it was "a useful

4. Only Penski, not Boland, was counsel in the Ada Co–Generation arbitration.

thing to do," particularly when the disclosure is made through counsel rather than AAA. He also said he did not believe he needed to disclose the May meeting with Nixon Peabody, but was "guided" by Boland, who he thought was "probably being excessively cautious." After the May meeting, he said he did not have any other involvement or knowledge or awareness of Nayak's communications with Nixon Peabody personnel. Further, he said he did not instruct Nayak to halt further contact with Nixon Peabody about Lexsite while he was serving as arbitrator because it had "no implications" for him. As for the email in which he referred to Lexsite business while accepting an arbitration, Stern said he did not believe the communication was inappropriate.

Other evidence showed that after Stern and Fraser were designated arbitrators, Stern communicated with both Penski and Boland about who should serve as the third arbitrator. In these communications, Stern referred to Ponderosa as "we" and "us" and referred to appellees as "opponents." Once the panel was finally selected and had issued its scheduling and procedural order, which contained the waiver of conflicts clause, Penski changed Nixon Peabody's fee arrangement with Ponderosa from an hourly rate to a contingent fee of 15 percent of the first $50 million of an award and 12.5 percent of any amount over $50 million.

Around this same time period, in October 2006, Stern arranged for the incorporation of Lexsite's American subsidiary.[5] Stern described the company as a liaison office between U.S. clients and the Indian parent company. Stern served as its chairman of the board and listed his office address as the company address. Although he received no compensation as the principal officer of the company and held no stock in it, he did charge Lexsite for the services of his legal assistant and summer intern. During the time the arbitration was pending, Stern estimated he talked with Nayak about twice a month to discuss Lexsite business.

Finally, the evidence showed that in April 2007, after all the evidence in the arbitration had been presented, but before the award issued, Nayak contacted Boland about "any progress on the litigation support services front." Boland responded that they needed to "wait about one more month or so" to resume discussions and asked Nayak to send another email in mid-May. Nayak thanked Boland for the update and also mentioned that he had spoken with another Nixon Peabody lawyer in the Boston office, Sam Goldblatt. Boland responded that Goldblatt was "a good person to know" and could be included in "our meetings later on." Ultimately, the evidence showed Nixon Peabody did not do any business with Lexsite.

Twenty-seven months after the hearing on the motion to confirm/motion to vacate concluded, the trial court issued its ten-page opinion and order vacating the arbitration award on the basis that Stern exhibited evident partiality by (1) failing to fully disclose the Lexsite and Nixon Peabody relationships and (2) failing to fully and completely disclose the relevant facts about the Ada Co–Generation arbitration. The trial court rejected other assertions that Stern exhibited evident partiality by (1) his statements and demeanor during the selection of a third arbitrator and by statements he made during the course of the arbitration hearing and (2) his failure

---

**5.** In June 2006, Lexsite changed its name to Exactus, and the American subsidiary was Exactus USA.

to fully and completely disclose relationships with various financial institutions. In addition, the trial court denied the motion to vacate on the grounds that (1) the arbitration award was procured by corruption, fraud, or undue means on the part of Ponderosa's counsel, (2) the arbitrators acted in manifest disregard of the law, and (3) the arbitrators exceeded their powers in modifying or amending the terms or provisions of the purchase agreement in dispute. The trial court vacated the arbitration award, denied the motion to confirm, and ordered the parties to submit their dispute to a new arbitration panel. In separate findings of fact and conclusions of law issued later, the trial court reiterated many of the findings and conclusions contained in the opinion and order.[6] Ponderosa appealed.

6. Among other things, the trial court specifically found:

18. Arbitrator Stern disclosed that he was appointed by 'Nixon Peabody' in February 2002 to serve as an arbitrator. He further disclosed that he was appointed as an arbitrator three times in 2006, all within one month's time, on 'the recommendation of Nixon Peabody.' Arbitrator Stern did not disclose that all of his contacts with Nixon Peabody, a law firm with approximately 700 lawyers, were in fact almost exclusively with Nixon Peabody attorneys Frank Penski and Connie Boland, counsel for Ponderosa Pine Energy.

19. In his disclosures to the parties, Arbitrator Stern stated that on May 3, 2006, he 'participated in a general discussion at the Nixon Peabody offices on the possible outsourcing of certain discovery tasks in litigation. I attended as a member of the Advisory Board of Lexsite, an Indian company which provides support to legal publishers, corporations, and law firms. Nixon–Peabody and Lexsite have done no business, and it is not clear that Nixon–Peabody would ever have any business to give to Lexsite.' This disclosure is incomplete and misleading.

20. Arbitrator Stern's involvement with Lexsite went significantly beyond simply being a member of the 'Advisory Board.' Arbitrator Stern was a shareholder in Lexsite, although the value of the shares was disputed, and had the option to purchase additional shares. After Lexsite changed its name to Exactus, Arbitrator Stern incorporated Exactus U.S. and served as its President. The address and telephone number for Exactus U.S. were Arbitrator Stern's business address and telephone number. In his deposition, Arbitrator Stern stated that he met with the CEO of Lexsite twice a month to discuss things such as marketing: Despite the passivity of Arbitrator Stern's disclosure (he 'attended as a member of the Advisory Board'), the evidence proved that Arbitrator Stern played a much larger, much more active role in Lexsite than he disclosed to the parties.

21. Arbitrator Stern admitted in his deposition that there was a second, earlier meeting with Nixon Peabody in April 2006 involving Lexsite soliciting business from Nixon Peabody that was not disclosed.

22. The Nixon Peabody meetings for Lexsite came about as a result of personal telephone calls by Arbitrator Stern to Frank Penski, lead counsel for Ponderosa Pine Energy.

23. Arbitrator Stern admitted that on or about June 17, 2006, he emailed Mr. Penski regarding 'any movement' of Nixon Peabody in regards to Lexsite. Arbitrator Stern was appointed by Ponderosa Pine Energy as its party-appointed arbitrator in the Tenaska arbitration ten days later on June 27, 2006.

24. From November 2006 to April 2007, the President of Lexsite (though not Arbitrator Stern) made at least two contacts with either Mr. Penski or Ms. Boland following up on possible business for Lexsite. While it is unclear from the record if Arbitrator Stern knew of these contacts, the further attempts to obtain business from the law firm representing a party in an arbitration are troubling. The impression during the pendency of the arbitration was clearly created and intentionally left open that Nixon Peabody might use Lexsite in the future.

25. It is very troubling that Ponderosa Pine Energy's counsel edited and modified Arbitrator Stern's disclosures. Arbitrator Stern admitted and the evidence proved that Ponderosa Pine Energy's counsel added the sentence 'Nixon–Peabody and Lexsite have done no business, and it is not clear that Nixon–Peabody would ever have

any business to give Lexsite.' Arbitrator Stern did not disclose that he submitted his disclosures to the party appointing him for modification and/or approval before disclosing them to all of the parties. The addition of this sentence was an attempt by Ponderosa Pine Energy's counsel to minimize the relationship between Arbitrator Stern, Lexsite, and Nixon Peabody and to mislead the Defendants. While Ponderosa Pine Energy's counsel added the sentence, Arbitrator Stern then produced his disclosures with the Nixon Peabody created sentence in them, thereby adopting the language.

26. When viewed in the totality of the circumstances, including the fact that Arbitrator Stern failed to disclose that his contact with Nixon Peabody were all with Mr. Penski or Ms. Boland, failed to disclose additional meetings or contacts regarding Lexsite with [Ponderosa's] counsel, failed to disclose the true extent of his ties to Lexsite with his activities for Lexsite, and allowed [Ponderosa's] counsel to modify his disclosures in a way that minimized his contact, the Court finds that Arbitrator Stern's disclosures were intentionally incomplete and inaccurate.

27. Arbitrator Stern's contacts with Nixon Peabody regarding Lexsite were within three months or less of his appointment as an arbitrator in the current case. Three of Arbitrator Stern's appointments as an arbitrator by Mr. Penski and Ms. Boland were all within a month of each other, just after the Lexsite meetings.

28. Arbitrator Stern believed that he had a direct (potential) business relationship with a party's counsel.

29. Arbitrator Stern minimized his relationship with Mr. Penski and Ms. Boland.

30. Arbitrator Stern did not disclose additional contacts that he had made with Nixon Peabody in regards to Lexsite.

31. Arbitrator Stern downplayed his status as that of a member of an "Advisory Board," when in fact he played a much larger and more active role in Lexsite.

32. Arbitrator Stern's relationship with Mr. Penski and Ms. Boland was material and not trivial.

33. There was no clear evidence of the value of Arbitrator Stern's financial interest in Lexsite or Exactus U.S. or the potential profits he expected to earn, and Nixon Peabody never signed a contract with Lexsite or gave Lexsite any business during the pendency of the arbitration or even after.

However, the potential for future business hung like a carrot in front of a mule during the entirety of the arbitration proceedings in this case. The lure of potential business is as powerful a motivation as past business.

34. The Lexsite connection had nothing to do with the issues in the arbitration, but everything to do with the arbitrator's motivation.

35. There was a calculated, deliberate attempt to minimize the relationship or conflict involving Lexsite.

36. The Lexsite/Nixon Peabody relationship was material, not trivial and should have been disclosed to all parties and the other arbitrators. Only with such disclosure could the parties have made an intelligent decision regarding a possible objection to Arbitrator Stern.

\* \* \* \*

37. Arbitrator Stern disclosed that '[o]n July 12, 2006, I was appointed an arbitrator by the claimant, on the recommendation of Nixon–Peabody, in *Ada Co. Generation Limited Partnership [sic] v. Amway Co.*'

38. Mr. Penski, Ponderosa Pine Energy's lead counsel, represented Ada Cogeneration in that arbitration.

39. Ada Cogeneration was owned by Delta Power Co., which was also the original owner of Ponderosa Pine Energy.

40. Both the Nixon Peabody attorneys and Arbitrator Stern were aware of the Delta Power connection with the Ada Cogeneration arbitration.

41. Ms. Boland sent Arbitrator Stern an email stating that he needed to draft a disclosure statement that included 'the currently pending Delta arbitration.'

42. The Assignment of Purchase Agreement, one of the core documents forming the basis of the [Ponderosa] arbitration, was executed by Delta Power Co.

43. [Ponderosa's] witness list and supplemental letter filed shortly before the Tenaska arbitration began clearly included two current or former employees of Delta Power Co. Shakil Rahman, the former general counsel of Delta Power Co., participated in the Tenaska arbitration as a consultant to [Ponderosa's] counsel and testified at the Tenaska arbitration on behalf of [Ponderosa]. At least one other Delta Power Co. employee testified at the Tenaska arbitration.

44. Despite the fact that the Ada Cogeneration arbitration and the Tenaska arbitra-

In its sole issue, Ponderosa contends the trial court misinterpreted and misapplied the law when it vacated the arbitration award on the ground of evident partiality. Specifically, Ponderosa argues that Stern divulged information about his relationships with the lawyers, Lexsite, and the Ada Co–Generation arbitration sufficient to put appellees on notice of the facts giving rise to what they now argue is a reasonable possibility of partiality. They contend that appellees, by choosing not to not investigate further or to object, waived any post-arbitration partiality complaint. To hold otherwise, they say, would encourage parties to engage in "obvious sandbag-

tion were being conducted in the same time frame and despite an on-going obligation to disclose conflicts, no disclosure was ever made to the Defendants regarding the common ownership by Delta Power Co. of parties to both the arbitrations.

45. Nixon Peabody referred to the Ada Cogeneration case as the 'Delta Power' matter with Stern. In reviewing the documents admitted as evidence and the introduction of witnesses as current or former employees of Delta Power Co., Arbitrator Stern should have been aware of the overlapping parties in the Tenaska and Ada Cogeneration arbitrations. By not disclosing the overlapping ownership, Arbitrator Stern placed himself in a position where he potentially could have received *ex parte* communications about the Tenaska arbitration. There is no evidence that Arbitrator Stern made any attempt to investigate possible conflicts in the Tenaska and Ada Co-Generation arbitrations.

\* \* \*

49. [Ponderosa's] counsel assisted in creating a misimpression regarding Arbitrator Sterns' [sic] contacts with Mr. Penski and Ms. Boland regarding Lexsite and the extent of his specific contacts with Mr. Penski and Ms. Boland.

50. It is very clear that [Ponderosa's] counsel was attempting to stack the deck in favor of their client.

\* \* \*

56. Arbitrator Stern and [Ponderosa's] counsel deliberately misled opposing counsel and obfuscated Arbitrator Stern's relationships or conflicts regarding the Tenaska arbitration.

Among the trial court's conclusions of law were the following:

33. When viewed in the totality of the circumstances, including the fact that Arbitrator Stern failed to disclose that his contacts with Nixon Peabody were almost all with Mr. Penski or Ms. Boland, failed to disclose

additional meetings or contacts regarding Lexsite with [Ponderosa's] counsel, failed to disclose the true extent of his ties to Lexsite and his activities for Lexsite, and allowed [Ponderosa's] counsel to modify his disclosures in a way that minimized the contact, the Court concludes that Arbitrator Stern's disclosures were intentionally incomplete and inaccurate.

\* \* \*

37. Applying the objective standard required by *Burlington Northern Railroad Co. v. TUCO, Inc.*, 960 S.W.2d 629 (Tex.1997), an objective observer might have a reasonable impression that Arbitrator Stern was not impartial.

\* \* \*

41. Arbitrator Stern's failure to fully disclose all relevant facts about the Ada Co-Generation arbitration creates a reasonable impression to an objective third-party [sic] that Arbitrator Stern might not be impartial.

42. Arbitrator Stern's failure to fully disclose all relevant facts about the Ada Co-Generation arbitration would create a reasonable impression to an objective third-party [sic] that Arbitrator Stern might not be impartial.

\* \* \*

48. The Defendants did not waive their right to object to Arbitrator Stern's nondiclosures by agreeing to the Scheduling Order signed by all the parties and the arbitrator on October 23, 2006.

49. Waiver is the deliberate relinquishment of a known right.

50. In light of the Court's findings that Arbitrator Stern and [Ponderosa's] counsel deliberately misled opposing counsel and obfuscated Arbitrator Stern's relationships or conflicts regarding the Tenaska arbitration, the Defendants could not have deliberately relinquished something they did not know existed.

ging" and to "strategically embed error in the arbitration record by intentionally choosing not to inquire about disclosed relationships."

Appellees respond that merely disclosing relationships is not enough, particularly where, as here, the disclosures have been "tailored to obscure or minimize material facts." Any other rule, they argue, "would allow a party or arbitrator-designate, if so motivated, to artfully conceal or minimize facts that might create an impression of an arbitrator's partiality." Appellees focus on the facts Stern did not disclose about the relationship and argue those undisclosed facts rendered Stern evidently partial.

## II. Standard of Review

 We review the trial court's order vacating the arbitration award de novo based on a review of the entire record.[7] *Alim v. KBR (Kellogg, Brown & Root)-Halliburton*, 331 S.W.3d 178, 181 (Tex. App.-Dallas 2011, no pet.); *In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 397 (Tex.App.-Dallas 2009, pet. denied). In making this review, we are mindful that arbitration of disputes is strongly favored under both federal and Texas law. *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex.1995) (orig.proceeding) (per curiam). Arbitration is founded upon the consent of parties to forego their right to litigate disputes in our court system and instead submit them to a private decision maker. *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 803 (Tex.App.-Austin 2004, pet. denied). Judicial review of an arbitration award adds expense and delay and thereby diminishes the benefits of arbitration as an efficient, economical system for resolving disputes. *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex.2002).

 To assure that arbitration serves as an efficient and cost-effective alternative to litigation, and to hold parties to their agreements to arbitrate, the FAA narrowly restricts judicial review of arbitration awards. *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 280 (5th Cir.2007) (en banc). In fact, the grounds listed in the statute are the exclusive grounds for vacating an arbitration award under the FAA. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 583, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008); *see also Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 350 (5th Cir. 2009) (concluding *Hall Street* restricts grounds for vacatur to those set forth in section 10). One ground for vacating an arbitration award under the FAA is evident partiality of the arbitrator. 9 U.S.C.A. § 10(a)(2) (2009).

## III. Evident Partiality

 A prospective neutral arbitrator exhibits evident partiality if he does not disclose facts that might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *Burlington N. R.R. v. TUCO, Inc.*, 960 S.W.2d 629, 636 (Tex.1997); *Thomas James Assocs., Inc. v. Owens*, 1 S.W.3d 315, 321 (Tex. App.-Dallas 1999, no pet.) (extending *TUCO's* holding to arbitrations subject to the FAA). Evident partiality is established from the *nondisclosure itself*, regardless of whether the nondisclosed information necessarily establishes partiality or bias. *TUCO*, 960 S.W.2d at 636.

 This standard reflects the supreme court's recognition of Justice White's concurring opinion in *Commonwealth Coatings Corp. v. Cont'l Casualty Co.*, 393 U.S.

---

7. The trial court found the Federal Arbitration Act (FAA) applies to this case, and neither party challenges that finding. Accordingly, we apply the FAA.

145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) regarding the role of the judiciary as it relates to arbitrator impartiality:

> The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

*TUCO,* 960 S.W.2d at 635–36 (quoting *Commonwealth Coatings,* 393 U.S. at 151, 89 S.Ct. 337) (White, J., concurring). Implicit in *TUCO*'s full disclosure rule, as well as the broader concept of arbitration as a consensual dispute resolution process, is the idea that parties can agree to arbitrate a dispute, or continue arbitrating a dispute, even in the face of facts suggesting possible arbitrator bias or partiality. *Kendall Builders,* 149 S.W.3d at 804. As expressed by the *TUCO* court, "the most capable arbitrators are often those persons with extensive experience in the industry, who may naturally have had past dealings with the parties." *TUCO,* 960 S.W.2d at 635. The *TUCO* court went on to say:

> Thus, arbitrators should not be per se disqualified because of a business relationship with a party. Instead, the competing goals of expertise and impartiality must be balanced. Where the parties have agreed to select their own arbitrators, they should strike this balance in the selection process.

*TUCO,* 960 S.W.2d at 635.

▆▆▆ Thus, when choosing a neutral arbitrator, the parties must weigh the competing factors of the arbitrator's knowledge and experience against his potential conflicts. *Skidmore Energy, Inc. v. Maxus (U.S.) Exploration Co.,* 345 S.W.3d 672, 678 (Tex.App.-Dallas 2011, pet. denied). While parties can perform an intelligent analysis only if they have access to all information that "could reasonably affect the arbitrator's partiality," *TUCO,* 960 S.W.2d at 635, an arbitrator cannot be expected to provide parties with all the minute details of every relationship. *See Commonwealth Coatings,* 393 U.S. at 152, 89 S.Ct. 337 (White, J., concurring) ("[A]n arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography."). While a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure. *TUCO,* 960 S.W.2d at 637. Under *TUCO*'s objective test, the consequences of nondisclosure are directly tied to the materiality of the unrevealed information. *Mariner Fin. Grp., Inc. v. Bossley,* 79 S.W.3d 30, 32 (Tex. 2002).

## IV. Waiver

▆▆▆ "Consistent with these principles, a party can waive an otherwise valid objection to the partiality of the arbitrator by proceeding with arbitration despite knowledge of facts giving rise to such an objection." *Kendall Builders,* 149 S.W.3d at 804; *see TUCO,* 960 S.W.2d at 637 n. 9 ("Of course, a party who learns of a conflict before the arbitrator issues his or her decision must promptly object to avoid waiving the complaint."); *see also Roehrs v. FSI Holdings, Inc.,* 246 S.W.3d 796, 806 (Tex.App.-Dallas 2008, pet. denied) ("A party that learns of a basis for objecting to an arbitrator must promptly object in the arbitration proceeding to avoid waiving the complaint."). In the arbitration context, waiver has been defined as the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *Kendall Builders,* 149 S.W.3d at 804;

*see Alim,* 331 S.W.3d at 182 (concluding "innocuous comment" did not establish that losing party at arbitration "had knowledge of the undisclosed fact sufficient to support a finding that Alim intentionally waived his right to object ... or acted inconsistently with claiming that right"). A party intentionally and knowingly relinquishes its right to complain of an arbitrator's partiality if the arbitrator divulges information "sufficient to place [the party] on notice of the facts giving rise to what [it] now contend[s] is a reasonable possibility of partiality." *Kendall Builders,* 149 S.W.3d at 805; *see Skidmore,* 345 S.W.3d at 684 ("A party who knows or *has reason to know* of an arbitrator's alleged bias but remains silent pending the outcome of the arbitration waives the right to complain.") (emphasis added); *Mariner Fin.,* 79 S.W.3d at 35–36 (Owen, J., concurring) ("An arbitration award should not be vacated for 'evident partiality' based solely on a failure to disclose if the party seeking to vacate the award could reasonably have been expected to know the undisclosed facts."). A party "may not sit idly by during the arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrator when the result turns out to be adverse." *Skidmore,* 345 S.W.3d at 684 (quoting *Bossley v. Mariner Fin. Grp., Inc.,* 11 S.W.3d 349, 351–52 (Tex.App.-Houston [1st Dist.] 2000), *aff'd,* 79 S.W.3d 30 (Tex.2002)).

Similar to Texas courts, federal jurisdictions have also invoked the waiver principle under circumstances in which the complaining party knew or should have known of the potential partiality of an arbitrator, but failed to object before the arbitration decision. *See, e.g., Fid. Fed. Bank, FSB v. Durga Ma Corp.,* 386 F.3d 1306, 1313 (9th Cir.2004) (holding that waiver doctrine applies where party to arbitration has constructive knowledge of potential conflict,

but fails to object prior to arbitration decision); *JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103,* 324 F.3d 42, 52 (1st Cir.2003) (concluding that party waived evident partiality complaint when it "was put on notice of the risk" when it signed contract providing for industry-represented arbitration panel and "chose not to inquire about the backgrounds of the Committee members either before or during the hearing"); *Kiernan v. Piper Jaffray Cos., Inc.,* 137 F.3d 588, 593 (8th Cir.1998) ("While they did not have full knowledge of all the relationships to which they now object, they did have concerns about [the arbitrator's] partiality and yet chose to have her remain on the panel rather than spend time and money investigating further until losing the arbitration."); *Cook Indus. v. C. Itoh & Co.,* 449 F.2d 106, 108 (2nd Cir.1971) ("When a party has knowledge of facts *possibly indicating bias or partiality* on the part of the arbitrator he cannot remain silent and later object to the award of the arbitrator on that ground.") (emphasis added).

## V. Application of Law to Facts

We begin by noting that the material facts in this case are not in dispute. It is the legal effect of those facts that is in question and that we must decide. *See Las Palmas Med. Ctr. v. Moore,* 349 S.W.3d 57, 67 (Tex.App.-El Paso 2010, pet. denied) (explaining that since operative facts were undisputed, trial court made no factual determinations that would be entitled to deference, and only issue is legal conclusion to be drawn from facts). Because of the nature of the dispute and the parties' complaints, we presented above a comprehensive review of the evidence presented. However, not all of those facts are necessarily germane to the legal analysis.

In *TUCO,* the arbitrator knew that three weeks before the arbitration hearing

began, his law firm had received a referral of a substantial matter from the law firm of his co-arbitrator. 960 S.W.2d at 631. The arbitrator did not disclose this information. *Id.* Thus, the relationship was unknown to the parties "in the sense it was neither open, obvious, nor easily discoverable." *Mariner Fin.,* 79 S.W.3d at 33–34. The Texas Supreme Court concluded the arbitrator's undisclosed referral "might have conveyed an impression of [the arbitrator's] bias to a reasonable person." *TUCO,* 960 S.W.2d at 637. "[T]he fact that a reasonable person could conclude that the referral *might* affect [the arbitrator's] impartiality triggers the duty of disclosure. [The arbitrator's] failure to disclose the referral constitutes evident partiality under the Act." *Id.* at 639.

Unlike *TUCO,* the case before us involves relationships that were disclosed and were known to the parties. The question we must decide is whether the information Stern provided to the parties was sufficient to place them on notice of the facts giving rise to what they now argue is a reasonable possibility of partiality. *See Kendall Builders,* 149 S.W.3d at 805; *Skidmore,* 345 S.W.3d at 684; *Mariner Fin.,* 79 S.W.3d at 35–36. Having reviewed the entire record, we conclude it did. We begin with the Lexsite and Nixon Peabody relationships.

### A. Stern's Relationships with Penski, Boland, and Lexsite

 The first basis on which appellees claim evident partiality, and the trial court agreed, involves Stern's alleged failure to fully disclose his relationships with Nixon Peabody and Lexsite. In his disclosure, Stern listed three arbitrations where he was recommended by Nixon Peabody and a fourth where he was appointed by the claimant, who was represented by Nixon Peabody. He did not disclose that Penski

and Boland, the Nixon Peabody lawyers representing Ponderosa, were the persons who recommended him as an arbitrator and represented the claimant in the fourth. He also did not disclose that Penski and Boland were his contacts in arranging the May 2006 meeting where a sales presentation for Lexsite was made to the Nixon Peabody law firm.

Stern's disclosure makes clear that, in the previous four-and-a-half years up to the time of his nomination in this case, Stern had been involved in four arbitrations in which Nixon Peabody was also directly involved. Specifically, in 2002, the claimant appointed Stern to an arbitration and Nixon Peabody represented the claimant. Further, his disclosure makes clear that his appointments in the last three cases on the recommendation of Nixon Peabody, on June 19, June 26 (this case), and July 12, 2006, all occurred within seven weeks of the August 2 disclosure. The disclosure also makes clear that in May 2006, only a month-and-a-half before Nixon Peabody designated Stern as arbitrator, Stern was at the Nixon Peabody offices to solicit business for Lexsite. Appellees' letter responding to Stern's disclosure showed appellees believed it was necessary to inquire further into Stern's banking relationships. Yet, having been put on notice of the possibility of partiality created by Stern's continuing relationship with Nixon Peabody, appellees chose not to inquire further. Appellees knew that a lawyer or lawyers at Nixon Peabody recommended Stern, and that someone at Nixon Peabody had arranged the May sales meeting. Given the information disclosed, a few basic and obvious questions posed to Stern when the disclosure was received would have adduced the very information that they are now complaining about and that the trial court found demonstrated

evident partiality.[8] Stern's disclosure was sufficient to place appellees on notice of the facts giving rise to what they now complain create a reasonable possibility of partiality respecting the Nixon Peabody relationship. *See Kendall*, 149 S.W.3d at 805.

Stern's disclosures as to Lexsite were also called into question after the award. In his disclosure statement, Stern specifically advised that as a member of the advisory board of Lexsite, he "participated in a general discussion" at the Nixon Peabody offices. In his CV that was provided to appellees at the time of his appointment, he stated he was a director of Lexsite.[9] However, the trial court found that Stern did not disclose that (1) he was a shareholder in Lexsite, (2) he had the option to purchase more shares, (3) he incorporated the American subsidiary, served as its chairman of the board, and listed his office address and telephone number for the company, (4) he met with the Lexsite CEO twice a month, and (5) there was a five- to ten-minute meeting in April between Penski and Nayak that preceded the May meeting at the Nixon Peabody offices.

The evidence showed that Stern had an extremely minor ownership interest in Lexsite, 3,000 shares of 13 million to 14 million shares outstanding, for which he paid $1,300. Although he had stock options, he had not exercised any of them. Furthermore, Stern disclosed he was director of Lexsite, which made a sales presentation to Nixon Peabody only one month before his designation as an arbitrator in this case and that he was present at the meeting. Information that Stern was on the advisory board, was present at the May meeting, and was director of Lexsite was sufficient to place appellees on notice

of facts giving rise to what it now contends is a reasonable possibility of partiality, i.e., additional connections with Lexsite.

Our analysis is informed by the Austin Court of Appeals's opinion in *Kendall Builders*. In *Kendall Builders*, two homeowners became dissatisfied with the contractor remodeling their home and terminated the contract. 149 S.W.3d at 800–01. The contractor, Kendall, sought payment for work completed. The homeowners disputed the claim, and Kendall placed liens on the property. *Id.* at 801. The parties submitted their dispute to arbitration and selected a neutral arbitrator from a AAA-approved list. The arbitrator held a hearing spanning three days. During a break, the arbitrator mentioned to one homeowner that he had bought stock at seven or eight dollars a share from Vignette, the company who employed the homeowner, and then asked whether the stock was "ever going to go up." *Id.* Neither the other homeowner nor their lawyer was present during the exchange. The homeowner involved in the conversation with the arbitrator told the other homeowner about it a couple of days later. *Id.* The arbitrator ultimately ruled in favor of the contractor.

After the unfavorable award, the homeowners mentioned the earlier exchange to their lawyer. The lawyer took the deposition of the arbitrator and learned the arbitrator had lost more than $5,000 due to a decrease in Vignette stock price, about a one-percent decrease in the arbitrator's net worth. *Id.* After learning this information, the homeowners filed an application to vacate the arbitration award based on evident partiality. *Id.* After conducting a hearing, the trial court vacated the award, finding the arbitrator's failure to

---

8. *See supra* note 6, pp. 366–68.

9. During post-arbitration discovery, Stern acknowledged this information was not accurate.

disclose his stock losses in the homeowner's employer's company constituted "evident partiality" and the homeowners did not waive their right to complain. *Id.* at 802. Kendall appealed.

The Austin court analyzed the law regarding waiver in evident partiality complaints in arbitrations. *Id.* at 804–05. Applying that law to the facts of the case, the court of appeals concluded the homeowners waived their complaint: "Having elected to proceed with arbitration in the face of their knowledge of the arbitrator's losses in Vignette stock, [the homeowners] cannot now complain of the outcome." *Id.* at 806.

Similarly, in this case, appellees had information regarding Stern's relationships with both Lexsite and Nixon Peabody. As in *Kendall,* that information failed to even pique appellees' curiosity at the time the information was disclosed. After the award, however, Stern's relationship gained significance that triggered an investigation and ultimately became the basis for an evident partiality challenge. Just as the homeowners' failure to act in *Kendall* precluded their complaint, so too does appellees' failure to object at the time of the disclosure in this case.

In reaching this conclusion, we have considered appellees' oral argument directing us to our previous opinion in *Alim,* an employment discrimination suit against KBR. In *Alim,* the AAA appointed an arbitrator, who represented in his notice of appointment that none of the party representatives, law firms, or parties had appeared before him in past arbitration cases. He also represented he "diligently conducted a conflicts check" and had "performed [his] obligations and duties to disclose in accordance with the Rules of the [AAA], Code of Ethics for Commercial Ar-

bitrators and/or all applicable statutes pertaining to arbitrator disclosures." *Alim,* 331 S.W.3d at 180. At the beginning of the arbitration hearing, however, the arbitrator stated that he had "over the years come across" KBR's party representative and its attorney. At the conclusion of the hearing, the arbitrator ruled in KBR's party's favor. *Id.*

Alim notified AAA that he objected to the award because the arbitrator failed to disclose his relationship with the opposing party and its counsel. *Id.* The evidence showed that six years earlier, the arbitrator had served as a neutral arbitrator in a matter where KBR's party representative represented an affiliate and that KBR's attorney had met the arbitrator eleven to twelve years earlier when their firms were representing opposing parties in a lawsuit.

In considering whether Alim waived his complaint, this Court reasoned that the arbitrator's "innocuous comment" at the beginning of the hearing that he had "come across" KBR's party representative did not "establish that Alim had knowledge of the undisclosed facts sufficient to support a finding that Alim intentionally waived his right to object to [the arbitrator] or acted inconsistently with claiming that right." *Id.* at 182.

■ The facts in *Alim* are distinguishable from those in this case. In *Alim,* the "disclosure" was nothing more than an "innocuous comment" whereas here Stern specifically disclosed his continuing relationships with Lexsite and Nixon Peabody. Having considered the evidence and applicable law, we conclude appellees have waived their evident partiality complaint as to Stern's relationships with Nixon Peabody and Lexsite.[10]

---

10. To the extent appellees argue the award should be vacated because Stern's nondisclo-

sure violated AAA ethical rules, such a failure does not, in and of itself, entitle a losing party

### B. Stern's Relationship with the Ada Co–Generation Arbitration

■ The second area of alleged non-disclosure involved the Ada Co–Generation arbitration. Appellees argued that Stern's only disclosure in this matter, that he was appointed as an arbitrator in the Ada Co–Generation arbitration on the recommendation of Nixon Peabody, gave no indication of either Penski's involvement as Ada's counsel or the common-parent connection Ada and Ponderosa shared with Delta Power. They asserted that months later, when Stern held hearings in the Ada arbitration, he had before him the "overlapping involvement" of Delta Power representatives in the two arbitrations. Nevertheless, appellees contend Stern improperly made no additional disclosure.

Ponderosa asserts that appellees knew from the beginning of the arbitration proceeding that Ada was partially and indirectly owned by Delta Power. It directs us to evidence, adduced before the arbitration hearing and during the arbitration hearing, showing that Delta Power owned a holding company called White Pine Energy that acquired a fifty-percent interest in Ada Co–Generation. In their brief, appellees acknowledge that "underlying documents and testimony . . . contained information showing a connection between White Pine and Ada Co–Generation, [but] they do not show that [appellees] 'knew from the beginning' that Ada Co–Generation and Delta Power were connected."

In this Court's recent opinion in *Skidmore Energy*, we addressed a similar complaint. In *Skidmore*, one of the party-appointed arbitrators disclosed he was on the board of directors of Transocean, Inc. During the course of the arbitration, demonstrative evidence and testimony indicated that drilling equipment owned by Transocean had been utilized by the appellee, Maxus Exploration, in connection with the drilling of a well whose lease was the subject of the arbitration. *Skidmore*, 345 S.W.3d at 679. No party or attorney objected or raised a question about the arbitrator's service as an arbitrator when the evidence was adduced. *Id.* at 680. After the appellants lost the arbitration, however, they raised the issue as a ground for vacating the award on evident partiality. *Id.*

In *Skidmore*, the arbitrator's deposition was taken during post-award discovery. The arbitrator testified that at the time he made his disclosures, he did not know about the business relationship between Transocean and Maxus and did not investigate any relationships Transocean might have with either party to the arbitration. Although he sat on the Transocean board, he did not know about Transocean's involvement in drilling the well until the arbitration hearing and said there "was no reaction or demonstration of surprise by the parties" when the evidence was adduced. The arbitrator did not again mention his relationship with Transocean. He assumed all the parties knew about Transocean's involvement in the drilling because the well was drilled on a lease that had "gone back and forth" between the two

to vacatur. *See Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 77 n. 22 (2nd Cir.2012) (citing *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d at 285 n. 5; *Montez v. Prudential Sec., Inc.*, 260 F.3d 980, 984 (8th Cir.2001); *ANR Coal Co., Inc. v. Cogentrix of N. Car. Inc.*, 173 F.3d 493, 499 (4th Cir.1999); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680–81 (7th Cir.1983). *But see Commonwealth Coatings*, 393 U.S. at 149, 89 S.Ct. 337 (Black, J.) (plurality op.) (describing the AAA disclosure guidelines as 'highly significant' to the evident partiality analysis); *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1109–10 (9th Cir.2007) (relying on ethical and arbitral rules as persuasive authority)).

parties. *Id.* at 680. Finally, other evidence showed the complaining party and its counsel had known for years of the business relationship between Maxus and Transocean. *Id.* at 681. This Court noted that a party who knows or has reason to know of an arbitrator's alleged bias, but remains silent pending the outcome of the arbitration award, waives the right to complain. *Id.* at 684. We then concluded appellants had waived their complaint "by failing to raise the issue prior to issuance of the arbitration award." *Id.* at 684.

Here, appellees' initial pleading in the arbitration in July 2006 references the White Pine project. Then, in January 2007, in a pre-arbitration deposition, Delta Power executive Richard G. Vicens testified he worked on the "White Pine transaction, which was an acquisition of a portion of ADA Cogeneration [sic][.]" During the arbitration hearing two months later, Vicens testified that White Pine Energy acquired Ada Co–Generation, and Delta's involvement "was to be the equity of White Pine Energy." He also testified that White Pine Energy was 100 percent owned by Delta Power. At the time this evidence was adduced, appellees knew Stern was an arbitrator on a case involving Ada Co–Generation on the recommendation of Nixon Peabody. They did not, however, ask any questions of Stern or raise any objection. Instead, they waited until the award issued. As in *Skidmore*, we conclude appellees waived any complaint by failing to assert it before the award issued.

Finally, we note that appellees repeatedly reference the trial court's conclusion that Stern's disclosure was "intentionally incomplete and inaccurate." They argue no court has ever "tolerated or condoned deliberately misleading arbitrator disclosures." Nor do we. In a case such as this, where significant continuing relationships were disclosed, we do not evaluate the "undisclosed facts" in isolation from the rest of the record as appellees would have us do. Rather, as reflected in our analysis above, we view those facts in the context of the information provided by Stern or elsewhere in the record. We also do not agree with appellees' characterization at oral argument that the disclosures made in this case were the equivalent of no disclosure at all or "worse." Viewing the disclosures in the context of the record, we conclude the disclosures are not the equivalent of a total lack of disclosure as in *TUCO,* and they otherwise met the test set out in *Kendall* and *Skidmore* and the like.

As stated by the Ninth Circuit Court of Appeals: "If arbitration is to work, it must not be subjected to undue judicial interference. Moreover, parties must be encouraged, nay required, to raise their complaints about the arbitration during the arbitration process itself, when that is possible." *Marino v. Writers Guild of Am. E., Inc.,* 992 F.2d 1480, 1484 (9th Cir.1993) (citations omitted). Here, when Stern's disclosures were made, it was possible for appellees to lodge their objections or to ask more questions. They chose to do neither.

We conclude the trial court erred by vacating the arbitration award on the basis that Stern failed to fully disclose his relationships with Lexsite, Nixon Peabody and its lawyers, and the Ada Co–Generation matter, rendering him evidently partial. We therefore decide Ponderosa's sole issue in its favor.

We reverse the trial court's order vacating the arbitration award and render judgment confirming the arbitration award.